Mitchell vs. the State of Georgia.

| 22 | 211 |
| 85 | 94 |

No. 44.—WILLIAM MITCHELL, plaintiff in error, vs. THE STATE OF GEORGIA, defendant in error.

[1.] It is the privilege of the party, who complains of the judgment in the Court below, to make out and tender to the Judge, who presided in the case, his bill of exceptions; and if it be consistent with what transpired in the cause; in other words, if it containe the truth, the whole truth, and nothing but the.

truth, and all the evidence material to a clear understanding of the errors complained of, it is the duty of the Judge to certify and sign the same.

If the bill of exceptions is not true and sufficiently full, so as to present the points fairly, the Judge may refuse the same, or suggest the defects so that the party may amend, or the Judge may rectify it himself.

The party may accept the bill as altered by the Judge, or reject it as he may see fit. Having accepted and presented it to this Court, he is bound by it, and the case must be decided accordingly.

[2.] Where a motion to continue a cause is refused, for want of diligence, and yet the witness is brought to the Court and testifies, it is no ground for a new trial—admitting that the Court erred in overruling the motion.

[3.] All grounds of a motion for a continuance must be urged and insisted on at once. And after a decision upon one or more grounds, no others, afterwards urged, will be heard by the Court.

[4.] It is not error in the Court to inquire of the prisoner or his counsel, if he will waive the arraignment, bill of indictment, and list of witnesses.

[5.] When the Solicitor General is prevented by sickness or other malady, bod ily or mental, from prosecuting, the Court may appoint some suitable person in his place.

[6.] It is no ground for a new trial, if one of the empanneled jurors assist the State in selecting a jury—the Court not noticing the fact, and the juror having disqualified himself from serving, upon his preliminary examination.

[7.] If the Court has cause to apprehend that the juror misapprehends the meaning of the statutory questions propounded for the purpose of testing his indifference, the Court may restate them to the juror.

[8.] The Court may take down the testimony itself, or appoint another to do it. When the Judge officiates, he should make no comments upon the testimony as taken down; and he should incorporate the whole of it.

[9.] It would be better neither for the Court or counsel, to refer to the power of the appellate tribunal, except to cite its authority as made known through its decisions.

[10.] In recognizing the right of the jury to judge of the Law, as well as the facts, the Court should not do it grudgingly, so as to restrict the jury in the full and free exercise of their right.

[11.] Included in 9.

[12. 13.] While it is true at common law, and in certain cases, under the penal code, that one person may kill another for the prevention of a forcible and atrocious crime, still to make such homicide justifiable, there must be an absolute necessity for it ; and it must be done in good faith to the public and not in the gratification of revenge, or the execution of a preconcerted plan or conspiracy, to take the life of the person killed.

[14.] As to reasonable doubts, the rule is simply this—that juries must not give their verdict against the prisoner, without plain and manifest proof of his guilt; which implies that where there is doubt, the consequence should be ac quittal of the party on trial; and it is not error, for the Courts to read from the

Mitchell vs. The State of Georgia.

books of Reports of this Court its exposition of this doctrine, by way of charge in explanation to the jury.

[15.] In charging a jury in a criminal case, it is not proper for the Court to excite their feelings by passionate appeals to their imagination ; but it may remind them, that they are intrusted with the administration of public justice on the one hand, and with the life, the liberty, and the honor of the prisoner on the other ; and that they should faithfully inquire whether he is guilty of the charge alleged against him in the indictment.

[16.] It is no ground to grant a new trial, that the names of the jury were not each separately called, when the verdict was received, provided they were all in the box at the time it was rendered and heard it read ; especially when the jury were recalled in a few moments after their discharge, and every one on oath declared that he heard the verdict read finding the defendant guilty of murder, and that he agreed to it.

[17.] When the verdict of the jury is contrary to law, or strongly and decidedly against the evidence, a new trial will be granted.

Murder, from Walker Superior Court.    Tried before Judge Brown, at November Term, 1856.

William Mitchell was indicted and put upon his trial for the murder of John S. Cole.

Defendant was asked if he was ready for trial.    His counsel answered that he was not, on account of the absence of a material witness, Sarah Cope, who resided out of the county about twenty miles distant.    Upon this showing the presiding Judge refused to allow a continuance, but sent an officer for the witness, *who had been subpœnaed.*

Counsel for prisoner requested the Court to insert in the order which he issued for Sarah Cope, the name of another witness, Green, who had not been subpœnaed, whose testimony to the same facts, he desired to have.. The Judge inserted his name, and replied that he would render the prisoner any assistance in his power, but that *the trial must proceed.*    The bailiff brought the witness, Sarah Cope, who was examined as a witness, on the part of the prisoner, but failed to get Green.

To this ruling and decision, counsel for prisoner excepted.

The presiding Judge next inquired of the Solicitor General

if he had arraigned prisoner, and said let it be attended to, if it had not been done. Prisoner's counsel replied, that he would waive the arraignment, but excepted to this interference and direction on the part of the Court.

The presiding Judge then inquired if prisoner would require a copy of the indictment and a list of the witnesses. Counsel for prisoner waived it, but again excepted to this interference and mode of proceeding, on the part of the Court.

There was a recess for dinner, and upon returning to the court-house, the Solicitor General failing to appear, the presiding Judge appointed a Solicitor, *pro tem.*, and ordered the trial to proceed. Soon afterwards the Solicitor General came into Court, and intimated his willingness to conduct the trial and go on with the case. The Judge being of opinion that he was incompetent, on account of recent indisposition, caused by the excessive use of artificial stimulants, to discharge the duties of his office, ordered the trial to proceed in charge of the Solicitor General, *pro tem.*, who conducted the trial to its conclusion. To this ruling and order counsel for prisoner excepted.

In making up the jury, one of the *talesmen* put upon the prisoner, after disqualifying himself, was permitted to assist the counsel for the State in the selection of jurors. And to this, counsel for prisoner excepted.

In forming the jury, in some instances, after a juror had been asked as to the formation and expression of an opinion, and as to having seen the crime committed, or hearing any portion of the evidence delivered on oath, and the answer was in the affirmative, the presiding Judge would again repeat the question putting each part distinctly and separately, and receive a different answer. And to this interference, and mode of proceeding, counsel for prisoner excepted.

The presiding Judge himself, took down the testimony as delivered from the stand by the witnesses, instead of appointing a clerk to do it. To this defendant excepted.

*Brief of Evidence for the State.*

*William U. Wardlaw,* sworn, says : In Walker county, 7th July, 1855, John S. Cole, the deceased, came to witness' grocery, for the purpose of exchanging some deeds to land with Mr. Wm. G. Mathis.   Aleck Thompson and William Mitchell, defendant, were there ; Mitchell came in the morning with Mr. Hamilton.   Witness asked Cole, when he came, to light, that he had a message for him ; he lit and came in, and witness asked him to take some brandy ; he at first refused ; Mitchell came in and offered to shake hands with Cole; they shook hands, and Cole said you have the advantage of me ; Mitchell said I suppose your name is Cole; and Cole said yes, and asked defendant his name, and where he lived ; he said he lived at the Owen's houses.   He asked Cole to drink with him ; Cole refused, and said he had just taken some with witness.   Defendant then took a dram, and jumped out and swore he was the best man on the hill, except his friends.   Mitchell then walked out of the house, and Cole stayed a few minutes and walked out himself.   Mitchell's gun was in the house ; before Cole went out witness saw Mitchell and Thompson talking together in the corner of the fence ; Mitchell came back and asked where in the hell his gun was, and witness said, there in the corner of the house ; he then asked for his shot-bag, and Thompson came and patted it, and showed him that he, Thompson, had it on. Cole, he supposes, got on his horse; soon after they went out witness heard a gun fire ; witness ran to the door and saw Cole and young Mr. Connelly running ; Connelly was ahead ; did not see Thompson at that time.   After witness got out of the house far enough to see, Mitchell raised his gun and fired at Cole, and at the crack of the gun, Cole fell.   Witness ran to Cole and said, what is the matter John ? he replied, I am a dead man.   Cole was brought to the grocery, and there died, the 13th day afterwards ; was shot on Saturday, and died the next Thursday week.   The ball took effect on the left side of the back-bone—in the back-bone—low down in

the back-bone. Witness did not see the first gun fired, and did not know, of his own knowledge, who fired it. The bullit, he would say, caused Cole's death. Mitchell jumped the fence, left his gun sitting in the corner of the fence, and ran off over the hill. Witness went and got the gun; witness saw no more of Mitchell; he left the country. The next time witness saw him, was in the neighborhood of Duck Town Copper Mines, some 60 miles from the place where Cole was killed, some weeks after the killing; never knew him to be in the neighborhood any more before he saw him near Duck Town. Cole and Mitchell seemed to be strangers.

*Cross Examined.*—Witness had been acquainted with Cole about 6 years; he would fight if imposed upon; was a brave man; has frequently seen him with arms at public times; he gambled some times. There had been a previous difficulty between Cole and Thompson. Cole had sworn he would kill him if he stayed in the country. Thompson had left a month or two. Witness had heard that Cole was coming that day to the grocery; does not know that Thompson knew Cole was coming. Witness expected a difficulty when he saw Cole and Thompson there; after Cole was shot, saw a repeater on him; thinks one barrel was not loaded; the caps looked old; does not know that it had been fired. Has known Mitchell since the first of last year. Witness was friendly with Cole. Never saw Mitchell when he was out of his right mind; has seen him drunk often; he had taken a good many drinks that day; was pretty well along in liquor. Cole and Connelly were friendly. They were both running in the direction of some stables. That evening, at night, was the next time witness saw Thompson; he then came to the grocery door. Mitchell stood about 20 steps from the door and shot Cole about 40 yards off. Cole had out his repeater when he was running.

*Re-examined by the State.*—The cause assigned by Cole for threatening Thompson's life, was, that Thompson had

Mitchell vs. The State of Georgia.

been sleeping with his, Cole's wife. Witness, from all the circumstances, thinks Cole had good cause for the threat.

*William J. Hunt,* was present some five or ten minutes after Cole rode up. Thompson and Mitchell went out together in the corner of the fence; witness passed by them, and heard Mitchell, defendant, say to Thompson, spring your triggers and cock your gun—shoot him first, if you can, God-damn him, for it's his notion to shoot you. Thompson and Mitchell both had their guns in their hands. Cole rode up towards them, a little out of his way. Thompson was standing behind a tree, and he throwed his gun round and snapped at Cole. Cole flung up his hand and said, Lord have mercy, he is trying to kill me; Cole then took his pistol out of his saddle-wallet. In jerking out the pistol, it fired in the contrary course from Mitchell and Thompson. Cole then jumped off of his horse, and Thompson flung down his gun and run, and Cole run after him, and run him about forty steps. When he got 40 steps off, Mitchell shot him. Mr. Mucklehanan said you had better be a citizen of some other country. He set down his gun, and jumped the fence and run off. Witness saw no more of defendant until he was brought back a prisoner, some three or four weeks after the killing.

The description of the wound given by Mr. Wardlaw, and his death are about correct. Does not know why Cole started a little out of his way in the direction of Thompson and defendant, when he started. There were other persons he may have been going to see. Witness does not know that he went that way for the purpose of a difficulty; supposes Cole went out of his way some 8 or 10 feet. The remark made by Mitchell to Thompson, was made about the time Cole was getting on his horse. Thompson was behind the tree, and witness does not believe Cole saw him; when he started Cole was in the road leading towards Mathis's, (the place he had started to,) when Thompson snapped at him. Thompson was 25 or 30 steps from Cole when Cole was shot. Con-

nelly was only running to get out of the way for fear he might be shot. There was no difficulty between Cole and Connelly. Cole was getting on his horse 25 or 30 steps from Thompson and defendant, when defendant made the remark to Thompson about cocking his gun, &c. Cole could not have overheard the remark. He was riding slowly along when the gun snapped at him. He had drawn no weapon, made no threat or demonstration; nor had he spoken to Thompson and Mitchell when the gun snapped.

*Cross Examined.*—Had known Cole three or four years; had never heard him called a dangerous man, unless he was imposed on; never knew him armed till after the difficulty between him and Thompson. Witness had heard Cole say he would kill Thompson if he stayed in the country. Cole said he caught Thompson and his wife together in the act of adultery, and for this reason he could not stay about him. Thompson left and went off, and occasionally passed back. Witness anticipated a difficulty when he saw them together, having heard the threats; saw no shooting, before the difficulty, at a target; saw no pistol drawn by Cole till after he was snapped at; he then lit and ran after Thompson, with the pistol in his hand. Witness has known defendant some 12 months or more; never saw him insane; has seen him drunk frequently; when drunk he was about like ordinary drunken men.

*Dr. G. G. Gordon,* sworn says: Was the attending physician of Cole after shot; the wound was in the back, not quite as low as the middle of the spinal column. The ball cut or injured the spinal chord. The wound was necessarily fatal. Thinks he died of the wound.

*Cross Examined.*—Has examined prisoner's head—finds two scars on his head, one probably an inch and a half long. There appears to be some depression of the skull-bone. The effect of the depression of the skull-bone might produce idiocy, insanity or convulsions. Witness was called to see defendant in jail, two or three months after he was put in jail.

Mitchell vs. The State of Georgia.

He was lying on the floor; appeared to be insensible; found his pulse full and bounding, and was going to bleed him, when he became furious, and fought imaginary monsters in the air; left him in that condition; he went back next day; defendant was then rational, and was complaining of his head. Could not say when the scars were made on his head; expects they were made before July was a year ago; cannot say they were.

*Re-examined by the State.*—It is in a person's power to deceive a physician, as to his condition, by stimulants, &c. Defendant was chained in the jail when witness saw him; did not seem to have taken violent exercise. The scars are so located on the head, that the depression of the skull might have affected the brain. Does not recollect that he noticed that defendant was intoxicated in the jail.

*Re-examined by Defendant.*—A person pre-disposed to insanity, by pressure of the skull on the brain, more affected by excitement which causes the blood to terminate to the brain.

*Eli W. Gladden,* sworn, says: Previous to the killing, witness and defendant had a conversation near the place where Cole caught Thompson and his wife together, and defendant said to witness, do you think Cole ought to kill Thompson? Witness said no; and he then said, do you think if you had been Thompson, you would have left the country? Witness said he thought not; defendant said no, nor he would not; he would have killed or been killed. Defendant then said he liked Thompson very well, for the acquaintance, and was rather a crony with him; and said Cole shall not kill Aleck Thompson in his presence, for he would be God-damned if he did not kill Cole first. Witness took defendant to be quick of comprehension; was quick spoken, and never saw any evidence of insanity; was frequently with him.

*George B. Lassater* sworn: Knows the night Dr. Gordon was called into the jail to see the defendant, the time testified to. Witness kept grocery that day, and defendant's brother-

in-law, Mr. Fair, bought two or three pints of liquor, and witness saw them pouring the liquor into the jail at the grates to defendant. They said they poured it in through a cane. The liquor was poured in during the day and Dr. Gordon was called in at night following.

Here the State rested.

### Evidence for Defendant.

*Isaiah Mucklehanan,* sworn: Was present and saw Mitchell shoot Cole, and saw Cole running after Thompson with a pistol in his hand. · He fell at the crack of the gun. Witness stepped it. Defendant shot 47 steps. Does not know how and why the difficulty occurred. Thompson had been at the grocery an hour or two before the difficulty. Witness was in the house and did not see Thompson with a gun. Witness saw Cole have the revolver or repeater in his hand. As Mitchell shot, Cole was either turning or trying to fire at Thompson. Had been acquainted with defendant five or six months. Had known Cole six or seven years. Had previously heard Cole swear he would kill Thompson on first sight, or he should kill him. This was several months previous to the difficulty. Cole had moved some twelve or fifteen miles from where he was killed, some two or three months or more, before he was killed. Cole told witness he saw his wife going to meet Thompson; that he did not at first suspect anything wrong till she tried to hide; he then told her to go on, he knew what she was up to, that she should not be disappointed. Witness knows nothing of Mrs. Cole's character; it was the opinion of the neighbors, that she had been too friendly with Thompson, but with no one else. Cole was not informed of the reports in the neighborhood about Thompson and his wife till after he saw what he did, above stated, and it was after this that the threats were made.

*Cross Examined.*—Cole gave as a reason why he was going to kill Thompson, that he was too friendly with his wife. Cole made the threat the next day after he caught Thompson

and his wife. Cole said he was following on and found Thompson lying on the ground, and Cole said he pulled out his knife and drew it across Thompson's throat, and told him he had a good mind to cut his throat, and that Thompson run. At the time of the shooting, Connelly was ahead of Thomson, running. Cole said afterwards, that his pistol would not fire. Mitchell left. Witness that night heard of of his being seen. After that night, he was there no more till brought back from Duck Town. Heard him talking the night he left, when some men were in pursuit.

*John S. Stewart* sworn: Was present at the grocery when Cole came. He was asked to light and go in and take a dram. He went in. Mitchell followed him in. Witness does not know what was done in the house. Cole came out and took Mr. Hunt out and talked to him. Mitchell went up near and stood with his gun on his arm, and his hand on the cock. Cole then got on his horse and rode towards Thompson and Mitchell. Witness saw Cole put his hand in his saddlebags and put it on his pistol. Not a word was said, till Thompson, who was behind a tree snapped at him. Cole could have seen Thompson. He dodged round the tree a time or two, and then run and Cole after him. When the gun snapped, as Cole drew out his pistol it fired. Does not know that Cole had his pistol cocked when he started.

*Cross Examined.*—Witness is cousin to Thompson. Thompson had witness' brother's gun; had it probably half an hour. Thompson was never in the house after Cole came. As soon as Cole got his horse, Mitchell told Thompson to shoot him, as his intention was to kill him. Cole made no effort to draw his pistol till Thompson snapped at him. He did not have time to spring the triggers and cock the gun after Cole started to go to them; had it cocked before.

*William S. Thompson* sworn: Was present at the time of the difficulty. Did not see the shooting. Saw Cole put his hand in his saddlebags and draw his pistol and cock it

in presence of Thompson. Thompson is son of witness. Cole came to the house of witness ten or eleven months before the difficulty and said he intended to have the life of Thompson. Thompson left and was gone ten or eleven months; his sister was taken sick and witness asked Cole if he might come home, he said yes; he afterwards came to the house of witness with a repeater that fired six times, and said nothing would satisfy him but his life; Thompson was not then there, he had come and was gone back to Tennessee.

*Cross Examined.*—Cole gave the leave to Thompson to come home; he came and stayed one night and then went back because he was hired in Tennessee at the Steam Mills. The time Cole came with the pistol, he did not hear the remark above stated, but only has what his children said about it; (his statement above not correct as cross examination showed.) He then said Cole made the remark at another time. The statement a little tangled.

*John Fair* sworn: Has known defendant between three and four years. Knew of his having been hit on the head two licks with a rifle gun by a man named Cruise. He was never out of his head before; has been occasionally since. He was confined two or three weeks at the time. He has at times been worse and at times better. Witness was afraid to be about him sometimes. He was inclined to sleep off the spells if not disturbed, if so, he was cross and angry. These spells came on once a month. He received the blows on the head two or three years ago. He would complain of his head a day or two before the spells would come on. He would remain in that condition when thus affected, one, two or three days. Has been in the woods with him at times when he was sensible as common, at other times wild. On one occasion, in the woods, he said he was lost about one quarter of a mile from home, and he threatened to kill witness if he did not take him home. The night before the killing, defendant's mother sent for witness and his wife. They went to her house; when they went, his mother had

him tied on the bed.   He waked and asked witness why he had him tied; he told him his mother had it done for fear he would hurt her.   He seemed satisfied and witness loosed him, and he went to sleep and  witness and wife went back home.   Witness went back after he got breakfast.   Defendant had not still eat breakfast.   He asked witness to go with him and kill a squirrel, that he could probably eat it.   They went but did not find a  squirrel, and they concluded to  go to the grocery and get a dram.   They went; defendant got to drinking and  would not go home.   Witness left him at the grocery, and the next he heard from him he had killed Cole. Defendant was  not in his  right mind  that morning; he did not look natural or appear natural.   He had drunk none the day before as he knew of.   The night after  the killing, witness saw defendant at his mother's in a fence corner asleep. On Sunday morning he waked up  and  seemed  reasonable, and his mother told him he had killed Cole.   He said, Lord have mercy, he hoped not.   His  mother persuaded him to leave.

*Cross Examined.*—He slept in the fence corner  all night; they wrapped him up with quilts, and did not wake him up; he stayed there till morning.   The time his mother tied him, he was  asleep.   Witness  is  brother-in-law  of  defendant. The neighborhood knew nothing of his condition.   The old lady kept  it from  the neighborhood.   The spells  came on him about the  quarter  before the full moon.   Witness says defendant had not drunk a  drop the day  before; then says he was with defendant most  of the day only.   Defendant, a good  hand to work, sometimes got a  little  drunk, always knew his business.   Witness gave defendant a  dram in the jail the time testified to by  Lasseter; only  bought  one pint and gave him some in a vial tied to a switch.   His story was not gotten up about the insanity  for the purpose of this defence.   They never  let any of the neighborhood know it, as he was all the help his mother had, and they were afraid he would  be sent off.   Witness was  not afraid to  leave him at

the grocery; did not suppose he would get into a difficulty.

*Martha Mitchell,* mother of defendant, sworn, says: He was a smart sensible boy till Cruise struck him with the gun, and killed him for a while. She says, Cruise broke the gun off at the breech and bent the barrel nearly double. It was done two years ago last Christmas. Defendant never appeared to her afterwards to have a constant good mind as he had before. The spells would commence by headache, &c. The spells came on about the last quarter of the moon. He looked purple in the face at these times. She never let it be known because she had no other help, and he was a good hand to work. If he was not excited, he slept it off. Sometimes he would say he was going to leave, and would put some of his clothes in a sack and start off and go about one hundred yards and go to sleep and come back and say he had been gone two or three weeks to Chattanooga, or somewhere else at work. He had been in one of these spells the night before, and had taken his carpet sack and had gone and left it at Wardlaws, and he said he went fifteen miles and back. She frequently bled him and thinks the spells did not then go as hard with him. She had tied him the night before for fear he would do wrong. She did not want him to leave home next morning. He came home after the killing, a while after dark. He slept in the corner of the fence. She told him when he waked that he had killed Cole, and he said, Lord have mercy upon me, I have not done it. He would go to sleep again, and wake up, and she would again tell him, and he would again repeat the same answer and go to sleep again.

*Cross Examined.*—He at times drank too much. The drinking of spirits never had any effect in producing these spells. He came home the night of the killing, just after dark. They did not tie him at the fence on the ground. Fair and his wife, and witness and her daughter, were all there. She covered him up in the fence corner. She supposes they all could have got him to the house. He waked

up occasionally. Could have walked to the house. She cared but little for him that night. He lay less than ten steps from the house that night. He did not leave till towards night next day. She hid him about in the ridges and in the bottoms and about. She stayed with him all day Sunday and until just before day Monday morning, she left him half a mile from her house. She does not recollect that she made any effort to get him into the house, the night he slept in the fence corner. She lived about three-quarters of a mile from Mr. Mucklehanan. She covered him up the night he lay there.

*Sarah Cope*, sworn: Says she has known Mitchell four or five years. He had a stroke on his head about two years. She did not see it done. Saw it directly afterwards. She stayed at his mother's house about one year after it was done, and she left. He occasionally had bad spells of his head and would ask his mother to walk with him. She would do so. He often said after he was struck with the gun that he did not feel right.

*Cross Examined.*—He has sometimes drunk liquor. She has known him have these spells when he had not been drinking. She is no relation. She now lives at Ringgold, at Mr. Overbee's. She never knew his mother to tie him while she stayed. The old woman never told witness she did not want it to get out that he was in that fix. She never spoke of his condition in the neighborhood. She never heard his insanity talked of in the neighborhood.

*Mrs. Margaret Fair*, states the same as the two last witnesses, about the wounds on the head and his derangement, &c. That he cursed her at her own house. She did not see him on the day of the difficulty till night. She thinks he was worse than usual the night before the difficulty.

*Cross Examined.*—Every spell he had was a good deal worse; not so bad at first. She saw him the night after the killing, lying in the fence corner. He was at her house on Friday to dinner. She was at home on Thursday and Fri-

day nights before the difficulty. She had not seen him from the time he eat dinner there on Friday, till she saw him after the killing. She is sister of defendant, and is wife of witness, Fair, who has been examined.

Here the evidence closed on the part of the defence.

### The State in reply.

*Isaiah Mucklehanan* reintroduced, says: He saw several men in pursuit of defendant the night after the killing, after dark, and heard defendant ask them why they were following him about, and said, if they did not cease to follow him he would cut them into mince pieces. It was defendant's voice he heard. He saw defendant that day drinking; nothing in his appearance that indicated insanity. Lived in half a mile of the mother of defendant at the time.

*Alfred U. Hunt,* sworn, says: At the time Cole and witness were talking aside, a little before the killing, Cole said to witness, there was one damned rascal there he thought he would kill that day. Defendant was not near at the time. He afterwards came near, and stood with his hand on the cock of his gun, and Cole then said to witness, I suppose you know who it is. Witness said he supposed he did. Mitchell was 'near by and Cole said, I will go and talk to him about it; meaning he would talk to Thompson about it.

*Israel Nations,* sworn, says: He had seen defendant at gatherings about, for four or five years. Defendant had been at witness' house and witness at his; lived part of the time three miles off, and part of the time two miles. Witness regarded him a man of ordinary mind; never saw any evidence of insanity. He was often in liquor, and was then ill-grained, if crossed any way; if not, he was rather good natured. He lived some three miles from witness when he got hurt. Heard that defendant occasionally had bad spells while he was having his wounds healed and afterwards. Had not seen much of defendant for the last six months before the killing. Here the State closed.

Mitchell vs. The State of Georgia.

*Defendant introduced in rebuttal:*

*William Duke,* who states that he is jailer, and that defendant since he has been in jail has had several spells. The first was the night that witness sent for Dr. Gordon. He had other spells but not so bad. That night he was asleep when witness went to the jail. He waked up in a rage and did not seem to have much sense. Another time when witness had a runaway negro in the jail, he got into a spell, and witness carried them both up stairs in the prison, for fear of some injury; has seen no signs of it lately.

*Cross Examined.*—Defendant was put in jail the first day of August was a year ago. Has not known of his having but three spells; knows not whether these spells were feigned. He had whiskey in the room. He has had whiskey whenever he wanted it. Does not know how often Fair poured liquor in through the cane since that time; and since witness took the cane from him. He has had a switch in the jail with a vial tied to it.

Here the evidence on both sides closed.

The presiding Judge, in his charge to the jury, referred to the position assumed by prisoner's counsel that they were the judges of the law and the facts, that counsel said he did it respectfully. The Judge said he did not know what counsel meant—that he would not charge counsel with intentional disrespect—that it was true, that by virtue of our statute, they were the judges of the *law and the facts* ; that it was the duty of the Court to give them the law as he understood it, and that it was also true as stated by the counsel, that the Court was responsible to the Supreme Court, if he committed an error ; that he was a fallible being and liable to err, and that they might, under the statute, decide against his opinion of the law, if they thought proper to do so. To which charge counsel for the prisoner excepted.

The presiding Judge charged, that prisoner had the right to kill, to prevent the commission of an atrocious crime, as murder, manslaughter or the like upon another, but he must

have acted in good faith, and must first have used all reasonable means in his power to prevent the perpetration of the crime; that if after using all reasonable means in his power to prevent Cole from killing Thompson, he was unable to prevent it otherwise than by killing Cole, he had a right to do so, provided he acted for the public good, or to say the least, he must have acted in good faith, but that this principle of law would not avail him if he acted in concert with Thompson in bringing about the difficulty—took part in the quarrel—made himself a party to it, and aided and assisted in bringing about the fatal rencounter. To which charge, prisoner's counsel excepted.

Upon the subject of doubts, being requested by the prisoner's counsel to charge, the presiding Judge read them a portion of the decision of the Supreme Court, as his charge on this subject, *vol. 6 Geo. Rep.* and concluded by saying to the jury that their minds and consciences must be satisfied of the guilt of the prisoner, *beyond the possibility of a reasonable doubt,* or that it was their sworn duty to acquit; but the doubt must be a reasonable one. To which charge prisoner's counsel excepted.

The Court said to the jury, that they were not to permit their sympathies to have any thing to do with their verdict. That they must meet out even handed justice between the parties, and if you convict the defendant when you are not satisfied of his guilt, and should he be innocent, remember that you are guilty and that his blood will rest upon you. On the other hand, if he is guilty, and you are satisfied of that fact, and acquit him, remember not only that you offend against the majesty of the law, but that the blood of a deceased fellow being cries to you from the ground. He who thundered from Sinai, " Thou shalt not kill" has also said of him who commits wilful, revengeful murder, " Thine eye shall not pity him"—" Thy life for the murderer's life if he escape." You will therefore, gentlemen, divest your minds of all prejudice and bias, and weigh this case deliberately,

calmly and dispassionately, and in the fear of God render your verdict according to the honest dictates of your consciences, and leave the consequences to themselves. To which charge prisoner's counsel excepted.

The jury found the prisoner guilty. After they returned and were seated and before the verdict was received, the Court asked prisoner's counsel if he desired to poll the jury, who replied that he did not. The Court then asked if he knew any reason why the verdict should not be received, to which he replied that he did not. The verdict was then received and read. The Court then discharged the jury and they dispersed. The Court remembering that the jury had not been called over each by name, before the verdict was received, had them all re-called within a few minutes after their discharge, and the Clerk called over the names of the jury. They all answered. The Court, then swore each juror to make true answers to such questions as should be asked them by the Court or its authority, and examined each one separately, who answered that he was one of the jurors who tried the case; that he was in the jury box when the verdict was read in open Court; that he heard it read; that it was a verdict of guilty of murder, and that he agreed to the verdict, as a juror. To which proceeding prisoner's counsel excepted.

A. R. WRIGHT, for plaintiff in error.

UNDERWOOD, representing the Sol. Gen., for defendant in error.

*By the Court.*—LUMPKIN, J. delivering the opinion.

[1.] The first objection in this case is, that the presiding Judge made out, himself, the bill of exceptions.

It is certainly the privilege of the party who complains of the judgment in the Court below, to make out and present to the Judge, who presided in the cause, his bill of exceptions.

If it be consistent with what transpired in the cause, in oth-er words, if it contains the truth, the whole truth and nothing but the truth; and all the evidence material to a clear un-derstanding of the error complained of, it is the duty of the Judge to certify and sign the same. If the bill of exceptions is not true, and sufficiently fully so as to present the points fairly, the Judge may refuse the same; or suggest to the party, the defects, so that he may amend the bill of excep-tions himself, or the Judge may do it, and the party complain-ing may rectify his own bill, or accept it as altered by the Judge, as he may see fit. Having accepted and presented the bill of exceptions as made out, we must act upon it, and we do not recognize this ground, therefore, as good on a mo-tion for a new trial. If the party is dissatisfied, a different course altogether should have been adopted.

[2.] The second objection is this: A motion was made by the prisoner to continue the cause, on account of the absence of Sarah Cope who was alleged in the showing, to be a mate-rial witness for the accused; that by defendant's direction a subpœna had been issued for her, and placed in the hands of the Sheriff, who stated that he had left the same at the last most notorious place of abode of the witness. The witness, it turned out, upon further inquiry, lived in Ringgold, Catoosa county, about 20 miles off, and not in Walker county where the trial was pending. She had removed several months before the subpœna was left at her former residence. The Court overruled the motion, for the reason that due diligence had not been used to procure the attendance of the witness. Some fifteen months had elapsed since the arrest of the pris-oner, and it did not appear that the materiality of this testi-mony had come but recently to the knowledge of the accus-ed. The Court stated at the same time, that he would dis-patch an officer after Miss Cope, and have her at Court by the time she was needed; accordingly she was brought, and was in attendance most of the day before she was exam-ined.

Admitting that the Court was wrong in holding that due diligence had not, under the circumstances, been shown to procure the testimony of the witness, which we do not, the error was abundantly atoned for by what subsequently transpired. The witness testified in behalf of the defendant on the trial; what more could he ask ?

[3.] The application being rejected, the Court announced that ,"the trial must proceed," and this last expression, as well as the manner of it, constitutes the third exception, and if there was anything wrong in the expression it certainly must have been in the manner of uttering or emphasizing it, and of this we are incapable of judging, and not in the language itself. The motion to continue being overruled and the defendant's counsel referring to the written affidavit and saying, " This is our showing." The Judge responds, " The trial must proceed." Court and counsel seem to have been equally impressive in announcing their respective determinations.

Counsel now complain that conceding that 'the showing made was insufficient or obviated by the promise of the Court to send for Miss Cope; that they were cut off from making any further attempt to continue the cause, by the solemn declaration, that the cause *must* proceed.

They were precluded by the 53d Common Law Practice, from amending their showing. It provides that, "all grounds of motion for nonsuit, in arrest of judgment, *and for continuance*; all objections to testimony, and all exceptions to declarations, must be urged and insisted upon *at once*, and after a decision upon one or more grounds, no others, afterwards urged, will be heard by the Court." 2 *Kel.* 476. Besides, the only other ground suggested in the argument is, that it might have been made to appear that the public prejudice was too much aroused to admit of an impartial trial ; sufficient time had elapsed to allow this excitement to subside, and no continuance could have been granted on that account.

[4.] The fourth objection is, that the Court itself perform-

ed the duties of the Solicitor General in "requiring" of the prisoner,—1st. A waiver of the arraignment; 2d, of a copy of the bill; and 3d, of the list of witnesses.

The Court did not "*require*" of the prisoner to do this, but *inquired* if he would? and to which *inquiry* the counsel for Mitchell answered affirmatively.

We see no error in this.

[5.] The fifth objection is, that the Solicitor General being unable, from indisposition, to perform his duty, the Court appointed Judge Hooper, a gentleman of acknowledged unexceptionable character, to officiate in his place.

The State must not go unrepresented, nor the criminal jurisdiction fail for want of a prosecuting officer; and if in the opinion of the Court, the States Attorney is unable from sickness, or any other malady of mind or body, from discharging his duty, it is not only the privilege, but the imperious duty of the Court, in the true spirit and intent of the Act of 1799, (*Cobb* 574,) to substitute another in his place.

[6.] As to the sixth objection, that one of the empanneled jurymen was permitted to aid the State in selecting the jury: the Judge certifies that he did not witness the impropriety complained of; and that had it come to his knowledge, it would have been rebuked. Prisoner's counsel made no objection at the time; and when Gladden, the juror was sworn, he disqualified himself, and was set down for cause, without having been put upon the accused.

[7.] The seventh objection is, that after the Solicitor General had asked the questions required by the statute, in making up the jury, the Court repeated the questions, frequently eliciting answers tending to prejudice the prisoner.

No doubt jurors frequently misapprehend the meaning of the questions propounded under the statute, and when put in the form therein prescribed, "Have you, from having seen the crime committed or having heard any part of the evidence delivered on oath, formed and expressed any opinion in regard to the guilt or innocence of the prisoner at the

bar?" perhaps the juror answers in the affimative. But separate the members of the sentence, and repropound the questions, Did you see the crime committed? Have you heard any portion of the evidence in this case, delivered on oath? perhaps the juror will reply in the negative to both of these interrogatories, thereby evincing he did not understand the question as originally asked. That jurors frequently fail to comprehend the true import of the question put to them, under the law, to test their indifferency, there can be no doubt; and that the Court should interpose to prevent mistake in this matter, there is just as little.

[8.] The eighth objection is, that the Court erred in taking down the testimony himself and in not having it done by another; and in omitting to take down a part of the proof.

If the Judge see fit to perform this service, the accused has no right to object, In taking down the testimony of Wm. S. Thompson, Judge Brown forgot, for a moment, his character as amanuensis, and as *Judge* says, "his statement above not correct as cross examination showed." He adds, "the statement a little tangled." While acting as amanuensis, he should confine himself strictly to that character, still this inadvertance is no ground for a new trial.

[9.] The ninth objection is, that the Court erred in replying to the argument of prisoner's counsel, in its charge to the jury, and manifested displeasure thereat, while it admitted the correctness of his position.

This complaint is not sustained by the bill of exceptions, and we dismiss it with the single remark, that all reference to the Supreme Court, either by Court or counsel, by way of menace or otherwise, except to cite its decisions, had best be dispensed with.

[10.] The tenth objection is, that while the Court stated the law correctly, namely, that the jury were the judge of the law, as well as of the facts, yet it so stated it as to destroy its force and defeat the object of the law.

This objection is not supported by the bill of exceptions.

We must say, however, in all kindness, that Courts acknowledge this right too grudgingly to the jury. We commend to their consideration what this Court has said upon this subject in *Keener vs. The State*, 18 *Ga. Rep.*, 194.

[11.] The eleventh assignment, that the Court stated to the jury, that if it erred, it was responsible to the Supreme Court, is included in the 9th.

[12. 13.] It is complained of in the next place, that the Court in charging the jury, that while one person has a right to kill another, to prevent the commission of an atrocious offence, he must use all reasonable means to prevent it, and that it must have been done for the public good.

The charge as given was this, " that prisoner had the right to kill to prevent the commission of an atrocious crime, such as murder, manslaughter or the like, but that he must have acted in good faith and used all reasonable means in his power to prevent the perpetration of the crime. But that this principle could avail the prisoner nothing if he acted in concert with Thompson in bringing about the difficulty; took part in the quarrel; made himself party to it; and aided and assisted in bringing about the fatal rencounter."

We do not think the prisoner has any cause to complain of this charge. Concede the common law doctrine, that homicide is justifiable for the prevention of any forcible and atrocious crime, must there not be an apparent necessity, on the part of the slayer—yea, an absolute necessity for the act—to make the killing justifiable? And must it not have been done, *bona fide*, to save life, and not wantonly or wickedly to destroy it? Under the pretext of punishing a felony, had Mitchell, the author and finisher of this whole tragedy, the right to kill in a spirit of revenge, and in the execution of a pre-conceived plan and purpose? Upon the proof in this case, does this killing stand upon the same footing of reason and justice, as that of a woman who kills another to save her person from lustful violence? And ought not the Court, in stating the principle, have qualified it as he did? Had

he failed to do so, the grossest abuse of a very delicate doc-
trine would have been the inevitable consequence.   Is it
probable that Cole would have killed Thompson, had he not
been shot by Mitchell ?   There was a time when trespassers
in aristocratic parks might be slain, provided they refused,
upon summons, to surrender themselves to the keepers.
That day is past.   The law is more tender of human life.
But even under the statute *de malefactoribus in parcis*, it
was incumbent on the keeper to show, that the deer-stealers
could not but escape unless they were killed.   The burden is
upon the defendant in this case to show that he was without
fault on his part.   The he *killed* to prevent *murder*.

[14.] The next error complained of is, the Court's charge
upon the subject of doubts : first, in referring to counsel's
speech ; and secondly, in not sufficiently charging upon this
subject.

The Judge certifies that he charged the jury in the very
words of the Supreme Court, in *Giles vs. the State*, (6, *Ga.
Rep.*, 276,) as to what kind of doubts should justify a jury in
acquitting a prisoner ; and if so, he ought not to be reversed
by this Court.   After all the exposition by text writers, and
illustrations by this and other Courts, the simple rule is, that
jurors must not convict without plain and manifest proof of
the prisoner's guilt.   And that intrusted as they are with the
administration of public justice on the one hand, and with the
life, the liberty, and the honor of the prisoner on the other,
their duty calls on them, before they pronounce a verdict of
condemnation, to ask themselves whether they are satisfied,
beyond a reasonable doubt, that the accused is guilty of the
charge alleged against him in the indictment.

And when the Court has said this, it has probably said
enough, both as to the rule of evidence, as well as the duty
of the jury, in the performance of their important functions.

[15.] As to this complaint, that it appears from the whole
mode, that the conduct of the Court may have damaged the

prisoner, and prevented him from having a fair trial, it is too vague and indefinite.    It presents nothing tangible.

[16.] The sixteenth objection is, that the jury was not called on, when it came into the box, to return its verdict, and the case of *Settle vs. Alison and others*, (8, *Ga. Rep.*, 208,) is cited in support of this assignment.

This Court held in that case, amongst other things, that where a jury had rendered an imperfect verdict by not finding all the issues submitted to them, that after the verdict had been received and recorded, and the jury discharged from the further consideration of the cause, that it was error in the Court, after the expiration of four days, to re-assemble the jury and amend the verdict, according to what the jury *then stated* it was their intention to find, such intention not appearing on the face of the verdict.

Here the jury returned into Court, with their verdict, finding the defendant guilty of murder ; when they were seated in the box, and before the verdict was received, the Court asked defendant's counsel if he desired to poll the jury ?    To which he replied he did not.    He was then asked if he knew of any reason why the verdict should not be received ?    He answered he did not.    The verdict was then received and read, the twelve jurors sitting in the box.    The jury were then dischar .d from the further consideration c. the case. The Court r collecting, after their dispersion, that the jury had not been called over, each by name, when the verdict was delivered, had them re-assembled, within from five to ten minutes, an oath was administered, and each juror swore that he was in the box when the verdict was read in open Court; that he heard it read ; that it found the defendant guilty of murder ; and that he agreed to it.

The statement of the case, not only acquits the Judge of the error reputed to him, but makes manifest the *tota cœla* difference between this case and the precedent referred to.

[17.] The last assignment is in these words:    "The jury in criminal cases, being the judges of the law, as well as of

the facts, when they misapply the law to the facts, and find an erroneous verdict, according to the facts, a new trial ought to be granted; and the jury did so find in this case."

Without stopping to controvert the proposition thus assumed, but which we must be permitted to say, is scarcely deducible from *Colquitt vs. Thomas et al.*, 8, *Ga. Rep.*, 258, certainly not in the amplitude in which it is stated, we are constrained to dissent from the conclusion, to which the learned counsel comes, that the verdict of the jury was contrary to the law and the facts of the case. There was, to say the least of it, ample testimony to justify the finding. Indeed, after a calm and dispassionate, and careful examination of the evidence, we must say, that, had we been in the place of the jury, we should have rendered the verdict which they did.

Judgment affirmed.