### 3104. GILLIS *v.* THE STATE.

1. There was no error.
2. The affinity dependent upon the relationship of brother-in-law does not confer the legal right of mutual defense.
3. In any case in which the defense urged is that the killing of the deceased was necessary to save the life of another person, the relationship existing between the slayer and the person alleged to have been defended, whether the tie be one of affinity, consanguinity, or close friend-

ship, or even the defenselessness of a person whose life is in danger, may be considered by the jury in connection with all, the facts and circumstances of the case, in determining whether the homicide stands upon a like footing of reason and justice with homicide in self-defense.

DECIDED JANUARY 31, 1911.

Conviction of manslaughter; from Montgomery superior court—Judge Martin. December 5, 1910.

*A. C. Saffold, Eschol Graham,* for plaintiff in error.

*E. D. Graham, solicitor-general,* contra.

RUSSELL, J. 1. Gillis was indicted for murder. There was ample testimony to have authorized his conviction of that offense. The jury found him guilty of voluntary manslaughter, and the trial judge refused a new trial. There was no error upon the trial. In so far as the numerous requests to charge were pertinent to the case, the principles involved were all embodied in the charge given, which is a model, as a clear, explicit, accurate, and absolutely impartial exposition of the law. It is true that the language employed in some of these requests was not used in the court's instructions, but the principle was in every instance presented in language fully as specific and appropriate.

2. The only point upon which a ruling is invoked here which requires any discussion is raised by certain requests to charge, which the judge, as we think, properly refused. It appeared in the evidence that Gillis, the defendant, was brother-in-law of one Isaac Walker, and there is testimony that Walker and the deceased were engaged in a difficulty at the time that Gillis inflicted the wound which caused the death of the deceased. It is only by straining the evidence that the inference can be indulged that Gillis made his attack upon the deceased for the purpose of defending his brother-in-law. In his own statement to the jury he does not plant his defense upon this ground. He says, in his statement, "I cut him to get him off of me," and this is the only reason given. If, however, there is a view of the evidence from which one might conclude that Gillis cut the deceased because he thought it necessary to do so in order to save the life of his brother-in-law, still it was not error to refuse the instructions requested upon that point. If, under any circumstances, Gillis had the right to kill the deceased in order to save Walker's life, or to prevent a felony from being committed on Walker, his justification can not depend upon the fact that Walker was his brother-in-law. The right of mutual defense,

which is accorded by the provisions of section 74 of the Penal Code (1895), in the very nature of things cannot be extended to brothers-in-law. From the presumption that there is an overpowering human impulse or an ineradicable bond of affection subsisting between parent and child, and even between brothers sprung from the same loins and nurtured at the same breast, a community of interest in the past and in the hopes of the future, the duty of mutual protection can be implied. We imagine that upon this implied duty to protect, the right of mutual defense, as a matter of law and as a legal right, depends. We could not extend the provisions of section 74 of the Penal Code so as to include brothers-in-law, if we desired to do so. But even if we had the power to do so, there is no reason upon which it can be asserted that the absolute legal right of mutually protecting each other should be extended so as to include brothers-in-law. Brothers-in-law are related only by affinity. They may be devoted friends, just as frequently they are wholly indifferent to each other. We do not say that a jury may not consider (along with the other facts and circumstances of a case) the relation that one who seeks to justify a homicide upon the ground that he killed in order to save the life of a third person, or to prevent a felony from being committed upon such a one, sustained at the time of the homicide to the person whom he alleges he was endeavoring to defend. This would be the submission to the jury of the question as to whether the killing, under all the facts and circumstances of the case, came within the provisions of section 75 of the Penal Code, which declares that in all other instances which stand upon a like footing of reason and justice as self-defense the homicide is justifiable. In *Mitchell* v. *State, 22 Ga.* 211 (68 Am. D. 493), the Supreme Court recognized the right of a mere bystander to interfere in a difficulty to prevent a felony; and in *Adams* v. *State, 72 Ga.* 85, the court held that life might be taken to prevent a felony upon an officer of the law. In *Futch* v. *State,* 90 *Ga.* 472 (16 S. E. 102), the Supreme Court did not criticise the instruction of the trial judge in which the jury were told that the defendant might justify the killing upon the ground that it was to prevent the debauching of his affianced wife. From these and other decisions we are of the opinion that the jury in any case of homicide, where the defense sought to be set up rests upon the proposition that the killing

was necessary or was thought by the slayer to be necessary, in order to save the life of a third person or to prevent a felony from being committed upon him, may take into consideration evidence offered for the purpose of showing the relationship existing between the slayer and the person alleged to have been defended. We do not restrict the meaning of the word "relationship" to the ties of affinity or consanguinity. We use it in a broader sense, as denominating any tie, even if it be ephemeral, which binds the parties together, and with reference to those relations, either of affinity or of comradeship or close friendship, which might tend to rebut the suspicion that the defense insisted upon was not bona fide and genuine. Nor do we mean to rule that proof of this kind can not be admitted even though the particular defense with which we are dealing is not presented; because relationships may illustrate interest and motive. Although my close friend be absent and in no danger, yet if one bitterly asperses his character, and, in an aggravated difficulty which ensues, I slay the calumniator, the jury would more readily believe that I acted under the impulse of passion and reduce their finding from murder to manslaughter, if it were indubitably proved that the person defamed was my closest friend, than they would listen to the suggestion if there were no other evidence upon the point than that we were strangers. The defendant in this case asked the judge to charge, as a matter of law, that he had a right to defend his brother-in-law. No such right exists as a matter of law, and, therefore, the court did not err in refusing the various requests to charge in which the right of one brother-in-law to defend another brother-in-law was asserted. The court might with propriety have charged the jury that they could consider the circumstances surrounding the parties at the time of the defendant's assault, including his connection with Walker by affinity, in connection with all the other facts and circumstances of the case, and could determine, as a matter of fact, whether the defendant, at the time the fatal blow was struck, was actuated by the fears of a reasonable man that a felony was about to be committed upon Walker, and, if they so found, that they might acquit; and that in determining whether the defendant bona fide believed that Walker's life was in danger, they might consider the fact that Walker was his brother-in-law,—this for the reason that our premonition that

evil will befall one is always quickened in proportion to our interest in the person whose injury we apprehend. No request, however, was made to this effect.

3. Exception is taken to the fact that the judge refused to charge that if the defendant cut and killed the deceased without intending to do so, he would be guilty of involuntary manslaughter, and instead of this charged the jury that an involuntary killing in the commission of an unlawful act, if the instrumentality used was such as in its consequences naturally tended to produce death, and death resulted as a consequence, would be murder, although the defendant may not have intended to kill. We understand this to be the law, and no other rule would be safe in a case like this, where there is no dispute as to the deadly manner in which the knife was used.          *Judgment affirmed.*