# Supreme Court of the State of Georgia,

## AT MILLEDGEVILLE,

# MAY TERM, 1862.

PRESENT—JOSEPH H. LUMPKIN, ⎱
RICHARD F. LYON, ⎰ JUDGES.
CHARLES J. JENKINS,

| 33 | 257 |
|----|-----|
| 119 | 436 |

JOHN, a slave, plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant in error.

1. Matters of fact are proved by moral evidence alone, and the most that can be affirmed of such things is, that there is no reasonable doubt concerning them.
2. In all criminal trials, whether dependent upon positive or circumstantial evidence, the only question is, not whether it be possible that the conclusion to which the proof points may be false, but whether there is sufficient testimony to satisfy the mind and conscience beyond a reasonable doubt.
3. If the degree of conviction be such that one would not hesitate to act upon it in matters of the highest concern and importance to his own interest, it is sufficient.

Murder, in Baldwin Superior Court. Tried before Judge HARRIS, at February Term, 1862.

At February Term, 1862, of Baldwin Superior Court, John, a slave, the property of L. D. Buckner, was put upon his trial on an indictment, found at the same term, charging

VOL. XXXIII—17.

him with the murder of a slave, Jackson, the property of Miss Maria MacDonald.

The State introduced the following testimony :

WILLIAM M. STEPHENS testifies : I know prisoner; saw him on the evening of the 8th September, fifteen minutes after sunset, or later ; saw both prisoner and deceased at Finnegan's branch, about two and half miles from Milledgeville; spoke to them, and said " good evening, boys;" Jackson, the deceased, said, " you had better say good evening, Jackson." In reply to my asking him what he said, Jackson repeated what he had said before, and I stopped, thinking to chastise him, when John, the prisoner, said, " see, they have stopped, you had better go along." Deceased said, " they know me." I then left, and as I was coming up the hill, I looked back and saw that prisoner and deceased crossed the branch going on towards Scottsboro'. One of the negroes, I can't say which, had a satchel or carpet bag in his hand. John belongs to Mr. Buckner, and Jackson belonged to Miss MacDonald.

CROSS-EXAMINED.—The deceased was insolent and drunk, John was sober; deceased was staggering, John perfectly cool.

L. L. WATERS corroborates the testimony of Stephens, the preceding witness.

ELAM JOHNSON swears: It is about three and a half miles from Milledgeville to Scottsboro', and about one and a quarter miles this side of Scottsboro' to the place where the body of Jackson was found. From Milledgeville Court House to Finnegan's branch it is two to two and a half miles. Deceased was found between a quarter and a half mile the other side of Finnegan's branch. Carter's mill is the other side of the branch. I saw the dead body about the 8th September. After I had passed Finnegan's branch, I met a negro who told me that there was a negro on ahead who had been murdered. This was between day-break and sunrise. The negro said he did not know who the deceased was; said the body was lying off in the old field a piece; said that as he came along he looked off to the right, and saw some one lying as though he were asleep ; went a little

John, a slave, *vs.* The State of Georgia.

further, and saw traces of blood, followed the trail where the body seemed to have been dragged, and came to deceased. About ten feet from the edge of the road there is a foot path, where a good deal of blood was seen. Rocks were lying in the path with blood on them, and near the path, in a little wash, there was a large rock with blood on it. I followed the trail, and found the deceased, no blood where he lay, but some on his sleeve. When I got to the point where the negro told me he first saw the body, I looked to see whether it could be seen from there, and I could see it very plainly. I went on to Scottsboro' from the place where I found the body, and told Mr. Buckner what I had seen, and of my meeting a negro man at Finnegan's branch, who had apparently refused to meet me as he had never done before. He turned out of the way, and took a path through the woods, which made me suspect that he knew something about the murder, or had some hand in it. This negro belonged to Mr. Keel, and was named Minor. I had never met the negro that far towards Midway before. I did not know where Minor was at work at that time. Minor had a wife at Buckner's; usually went to see her on Saturday night, and returned Monday morning. To have come from Mr. Buckner's, the path the negro took through the woods was the nearest way to the depot, where I think he was at work. Minor is a carpenter. I told Buckner that I had sent word to Haygood, at town, to meet me at Finnegan's branch with his hounds. Buckner and I went to the branch as soon as we could, and there met Haygood. The hounds were put out, and took a track which they followed to Midway. We followed the dogs, and after reaching Midway, the hounds changed their direction, and run off in Mr. Ramsay's field, and lost the track about the hotel. The party, then consisting of Buckner and others, went to the Milledgeville depot to see the boy Minor, and carefully examined him to see if there was any blood on his clothes or guilt in his countenance. Saw no blood about him, or signs of guilt. The party then came back to town, and learned that Buckner's boy was suspected, and I told Buckner about it when he went back to

Scottsboro'. When I got back to Buckner's house, the boy, John, came meeting me. I discovered his clothes were wet, and asked him "how come your clothes wet?" He answered that he had been drawing water at the well, and that the bucket had leaked on him. I then asked some other negroes, who were standing near, if they had seen John drawing water. They answered no, but one of them said he had seen John take a tub and go in the wash-room. I then examined John's clothes, and found, where they were dry, small spots of blood in many places, and where they were wet, larger spots, some as large as my thumb nail. I remarked to Buckner, this looks suspicious. I started on to the house, and Buckner said, "let's examine him further." I called the boy again, and he came up. I then stooped down, put on my spectacles, and said to Buckner, "I am satisfied." I then went to the house, and left John and his master together. John appeared to be a little excited when he was examined. When I first went to Buckner's, before I suspected John, I found him cutting wood. I spoke to him, and observed that he did not turn round to answer me, but turned his head over his shoulder to reply, his back being towards me, which circumstance I afterwards recalled as rather indicating his guilt. I saw blood from the breast down to the feet on the clothes; saw no other sign but that of blood. I was superintending Buckner's business. In the morning when I first got home, and told Buckner of the murder, in the course of the conversation Buckner said that some of his negroes would get in a scrape if they did not look out; that John had failed to come home and feed the hogs the night before. I got to Buckner's, the first time, a little after sun-up. John was present at this conversation.

CROSS-EXAMINED.—I was sworn before the committing magistrates. When I saw the negro who turned off from me on the road, I thought it was Keel's negro, or a runaway. After the negro crossed the fence, he broke off into a brisk trot. About nine or ten o'clock, when I first saw Minor, I examined the clothes he had on, his chest, and his hat. He had time to have changed his clothes. I judged from the

John, a slave, *vs.* The State of Georgia.

appearance of the blood where the murder had been committed, and the dew being knocked off the grass, that it could not have been committed more than fifteen or twenty, or perhaps thirty minutes. It was not more than two hundred yards from the place I met the boy to where the body was found. I met the boy before sun-rise; met Keel's negro a little after day-break, and before meeting the other boy. It is a mile and a quarter from where the body was found to Buckner's. I met the boy who turned out of the road a little after day-break; from where I met him to where the body was found was between a quarter and a half mile.

RE-EXAMINED BY STATE.—When I first saw the body it was lying on its face; a hat put carefully on the back of the head, another hat near by, and a dark satchel across one of the arms. A plug of tobacco was found near where the homicide took place. The side of the head was sunken in, and there appeared to be a hole just above one ear, and a cut in the temple; head appeared all broke up. The body was dragged down the road and off into the field. Some spots of brains on the ground where the homicide was, and in a wash, there was found a big, bloody rock, and a big spatter of brains near the rock. John claimed a woman at Miss MacDonald's as his wife. I can't say when the homicide was committed; it is only a matter of opinion.

RE-EXAMINED BY COUNSEL FOR PRISONER.—I thought the homicide occurred in the morning, because the dew had not formed again where the body had been dragged along, but does not think so now, because the body, when turned over at 10 o'clock, was stiff.

NATHAN C. KEEL testifies: On the Monday morning after the homicide the boy, Minor, who belongs to me, was at the depot soon after breakfast.

SALLIE KENAN, a slave, testifies: Sunday before the homicide, John was telling her his troubles; that he had a wife at Mr. Buckner's; the first year she had done very well, but the year after, she went to Miss MacDonald's, and had not done so well; that Jackson had gained her affections; that he had undermined him, he didn't know how, but that

Jackson would meet his deserts before he died. I saw prisoner between nine and ten o'clock Sunday, before the homicide.

SARAH WHITEHEAD, a slave, sworn, says, I saw prisoner in the afternoon of Sunday, the 8th September, and he asked me where Jackson was. After preaching, I heard John ask Jackson to go home with him. I saw them go off together. I was the wife of Jackson ; he was not at my house that night. Neither of the boys were drunk. They seemed to be cross, but I did not know for what.

CROSS-EXAMINED.—Jackson never stayed with any other woman, and never had missed staying with her any other Sunday night but that night, when John persuaded him to go with him. John and Jackson left near sun-set; heard no threats.

OSCAR, a slave of General Myricks, testifies : I saw John and Jackson together when the sun was about a half hour high, on Sunday, 8th September, about a half mile from town, in direction of Scottsboro', near Mr. Trippe's. They were at cross questions. John said to Jackson, he was not scared, and Jackson said he was not scared. John replied, nobody's money was scared but his. Jackson said, I have got no money to be scared. Both appeared to be drinking. John had a black oilcloth satchel in his hand. Jackson had none.

CROSS-EXAMINED.—Don't know who owned the satchel.

Sarah Whitehead, recalled, Jackson had a dark satchel when he left town.

GREEN, a slave of Colonel DuBignon's, swears, I overtook John the evening of the 8th of September, on this side of Carter's mill, about one hundred and fifty yards from the bridge. I was going from Milledgeville ; met with John about dark, seven ·or half past seven o'clock. John was standing on the roadside. I hailed him and asked who that was. John replied, it is me. I told him not to scare my horses, but to get out of the way. I soon discovered who it was, and at John's request I let him ride with me to Buckner's gate, where he got off, and I went down to the borough.

During the ride John said, Green, I have got no wife. I asked him if he and Lou had split. John replied that Jackson had been working some of his damned root works under the ground, and had cut him out; that he had swore to Jackson's mistress that morning that he and Jackson had made up, but he had told a damned lie. I told him if he did not mind he and Jackson would get to fighting, and one would murder the other. He said, no, I don't want to murder any man, and Buckner is a man who would not pay five cents to save him. I understood by this that Mr. Buckner would not protect him in anything wrong.

John also said, that if he had what he had last year, he would go and get in the bed, and if Jackson came there I would hear of somebody being dead before Tuesday morning. He said he had a bowie knife last year.

EDWARD, a slave, testifies : I met John and Jackson in Midway, on the 8th September, about sun-down, going towards Scottsboro'. John was talking rapid. He said, "I'll be G—d d—d if I don't do so," but I did not hear what. Jackson was drunk. If John was he did not show it. He was excited considerably.

CROSS-EXAMINED.—Did not hear what was said between them.

MINOR, a slave of Mr. Keel's, swears : I remember meeting Mr. Johnson the Monday morning referred to by him. I was coming from Mr. Buckner's and going to Mr. Keel's house at the depot. I turned off from the road by an old path, as stated by Mr. J. I usually went that way after crossing the fence. I jumped over a slashy place. I left Mr. Buckner's at nearly daylight. I saw John before I left. He came to my door and told me, as I went along that morning to look for two plugs of tobacco which he dropped somewhere on the road. I asked him where he lost it, and he replied he did not know, unless it worked out of his pocket when he got behind Mr. Grantland's carriage last night. He told me if I did not see him when I got back, to give the tobacco to two other negroes. I gave him three chews, and John went off in a hurry. He did not find the hogs that morning.

EDWARD, a slave, sworn, says: Two weeks before the homicide John told me that Jackson was fooling about his wife, and that if he did not let him alone he'd kill him.

General S. P. MYRICK testifies: I saw the body on Monday morning at eight o'clock; the limbs were stiff; the wounds were in the head, which was horribly mangled. I thought the death was caused by a wound from a knife.

CROSS-EXAMINED.—I saw the body twice; the last time about nine o'clock. The blood at the place where the homicide took place looked fresh, as if it had been recently shed. Did not examine the blood in the path, but that in the gully.

E. D. BROWN swears: I went to the body of deceased early on Monday morning, and then went to the place where he was probably killed. There was a stream of blood four or five feet long, and seemed to have been done several hours. There was some blood at a drain not far off, where there were some more bloody rocks; the blood there appeared fresher. The place where the blood appeared to be dried was the place where the first blood was spilt, and there was perhaps more blood there than at the place where the head seemed to have been mashed. The weather was warm.

CROSS-EXAMINED.—The second blood I saw was fresher. Some of the blood at this place had coagulated, and some not; some twelve or fifteen feet between the first blood seen and the place where the head was mashed. Blood in small quantities would probably coagulate in an hour.

PETER FERRELL deposes: I saw John on Sunday morning, and he told me there was a runaway to be found between Carter's mill and Finnegan's branch, who had an axe and a hatchet with a long handle to it, and he wanted me to come and catch him, that he was afraid he would kill some one if he was not caught. I told him to bait the negro, which he promised to do. John knew that I was marshal, and used to catching negroes.

L. D. BUCKNER testifies: On Monday morning after the murder I examined John, and found spatters of blood on his clothes from his hips down. Johnson came to my house a little before breakfast. It was an hour and a half before we

got off to body of deceased.    When I saw the blood on his clothes, John said that, after he had heard of the murder, he found he might be suspected, and he tried to wash the blood from his clothes, that it had come there by his having killed a pig; that Albert, another boy, had helped him to bring the pig to town; a part he had carried to Mrs. McComb's negro woman, and a part to the mother of his wife.    He said he had got the pig somewhere about the borough.    Mr. Miller complained of having lost some pigs.    Did not investigate the matter, because his boy was suspected of killing deceased. Don't know of John changing his clothes that day.    The girl of Mrs. McCombs, to whom the pig was carried, was named Cretia.

CROSS-EXAMINED.—Saw the hats where the body was found.    Neither of them belonged to John.    He might have changed his clothes while we were absent at the body.

DINAH, a slave, sworn, says:    I am the mother of Louisa, the wife of John.    John did not bring me a pig, or any part of one, any time about the homicide.

CROSS-EXAMINED.—I got a piece of pig from John about three months before.

LUCRETIA, a slave of Mr. McCombs, swears: John never brought me any pig, or sent any.

SARAH WHITEHEAD recalled:    Jackson had two hats, one a straw, the other a wool hat, which he took with him when he left; one he carried in his pocket or carpet-bag.

CROSS-EXAMINED.—Before he left he had one in his hand.

ELAM JOHNSON recalled :    One of the hats found at the body was a straw, the other a wool hat.    When I returned home after dinner, on Monday, John had on a pair of clean brown linen pants.    It was a warm day.

### EVIDENCE FOR THE DEFENSE.

Dr. THOMAS LAMAR testifies:    I saw the body on Monday morning between seven and eight o'clock; the blood looked fresh.    In my opinion the homicide took place between four and five o'clock that morning.

CROSS-EXAMINED.—I saw no blood except on the rocks.

I saw none which could coagulate ; saw no pool of blood. I did not remain long, and made no examination of the body. I could not form any satisfactory opinion from the appearance of the blood as to the time the homicide was committed.

WALTER PAINE, sworn, says: I saw John in town on Sunday, 8th September, also Jackson. I saw Jackson first at dusk by himself. I saw him again at half-past eight o'clock. I first saw him at the stable, the second time I saw him at Walter Mitchell's gate. I know him well, and conversed with him at Mitchell's gate. Did not see John after dinner. Jackson did not seem drunk.

RABUN COLLINS swears: I live about a quarter of a mile from where the homicide took place. A little before day I heard loud swearing and talking near about that place—in that direction. I heard two voices.

CROSS-EXAMINED.—I went to where the body was found; saw knife, two hats and some tobacco. One of the hats was in a carpet-bag. I never said anything about the loud cursing to any one. The hats, a small pocket-knife, and the tobacco were found where the bloody rocks were. The half of a bar of tobacco, with blood on it, was found there.

RE-EXAMINED.—The tobacco was found on the edge of the road, to the left, as you go out.

L. D. BUCKNER, recalled says: A small piece of tobacco and a white handled knife, with three blades, was found where deceased was killed. The balance of the plug, as discovered by fitting the two pieces together, was found in the carpet-bag of deceased.

CROSS-EXAMINED.—I do not remember who was present when the tobacco was fitted.

ALBERT, a slave, sworn, says: I saw John in the road on Sunday evening before Jackson was killed. After John left Mr. Buckner's he went down the road to Mrs. Fitzgerald's. It was about an hour in the night. John said he went to Mrs. Fitzgerald's. I don't know whether he did or not.

CHRISTIANNA, a slave, testifies: I saw John the Sunday night. He stayed at my house that night. He first entered

another house near mine, where I heard him talking. After awhile he came into my house, and went out before day. His wife turned him off. He was not accustomed to stay in my house.

CROSS-EXAMINED.—I dont know at what time John left my house. I think I went to sleep after he left.

WILLIAM FREENY, a slave, swears: I saw John coming from Miss MacDonald's about day-break.

DR. LAMAR, re-called in rebuttal by the State, says: From the appearance of the blood I saw, it might have been shed ten or fifteen hours.

The testimony here closed, and the Court having charged the jury, they returned a verdict of guilty. Counsel for prisoner moved for a new trial on the grounds following, to-wit:

1st. The verdict is contrary to law, and strongly and decidedly against the weight of evidence.

2d. That since the case was submitted to the jury, there has come to the knowledge of counsel for prisoner, additional evidence in his behalf, hereby verified by affidavit.

The affidavit was made by L. H. Briscoe, Esq., one of the counsel for John, who deposes, " that since the case was submitted to the jury it has come to the knowledge of the counsel for the accused, that John S. Thomas will testify, that on the morning of the 8th September he heard in the direction where the homicide was supposed to have been committed, loud noise and talking, indicating some difficulty, or violent altercation about day-break, or somewhat sooner, which testimony was unknown to counsel till after verdict rendered, and is regarded as highly material and important." This was sworn to before P. M. Compton, a Notary Public.

The Court refused to grant a new trial on any of the grounds taken in the motion, and this refusal is assigned as error.

BRISCOE, A. H. KENAN, for plaintiff in error.

LOFTON, Solicitor General, and McKINLEY, for defendant in error.

John, a slave, *vs*. The State of Georgia.

*By the Court*—LUMPKIN, J., delivering the opinion.

In this case, the fact that the deceased came to his death by violence inflicted by a third person, and that the homicide was malicious, is not disputed. And the only question is, who committed the crime? And the answer to this question depends upon circumstantial evidence, there being no direct proof of the guilt of the prisoner. This embraces a wide range of enquiry.

It has been well remarked, that very few crimes of great enormity, and involving a resort to violence in their perpetration, can be committed without leaving such traces in the circumstances by which they are attended as to lead to the detection and conviction of the perpetrator. It is rare, indeed, that any amount of coolness and calculation, any degree of ingenuity, or any power of foresight, has ever been sufficient to disentangle one from the meshes of that interminable web of circumstances which is interwoven around and into the nature and character of every criminal act. It constitutes one of the great guarantees which God has given, that the perpetrators of crime shall not go unpunished.

Evidence includes all the means by which any alleged matter of fact, the truth of which is submitted to investigation, is established or disproved. None but mathematical proof is susceptible of that high degree of evidence called demonstration, which excludes all possibility of error. Matters of fact are proved by moral evidence alone, and the most that can be affirmed of such things is, that there is no reasonable doubt concerning them. The true question therefore is, in all criminal trials whether dependent upon positive or circumstantial evidence, not whether it be possible that the conclusion at which the testimony points may be false, but whether there is sufficient proof of its truth to satisfy the mind and conscience beyond a reasonable doubt. In other words, to produce a degree of conviction that one would not hesitate to act upon in matters of the highest concern and importance to his own interest. (Wills on Circumstantial Evidence.)

John, a slave, *vs.* The State of Georgia.

The testimony in this case shows clearly that the prisoner had a motive for committing the crime. He was actuated by jealousy, of a most malignant and terrible character, such as that delineated by Shakespeare in his Moor of Venice. This passion had taken, entire possession of his bosom, and shook the throne of reason to its very centre. It is not shown that any other human being · in the world entertained any hatred toward the deceased. This taken in connection with the facts proven, show that revenge prompted the deed. The satchel, hats and tobacco of Jackson were found with his dead body, while the wounds inflicted upon his person demonstrate that every blow was guided by the most intense malice.

The communication, probably false, made to the Mayor of Milledgeville on the morning of the day when the murder was perpetrated, discloses the deliberate purpose teaming in the brain of the prisoner to kill his victim. His plan was then concocting, and he intended to put the community upon a false trail, hoping thereby to elude suspicion and detection.

When his clothes were found bespattered with the blood of the slain—which he attempted to wash out—he gave a false account of the cause why they were wet, and a still more false account of the cause of the blood itself. If there was any other way upon earth of accounting for these stains, why did he not explain it? Here opportunity was afforded him of testifying in his own behalf, and yet the statement he made is proven to be utterly untrue. Had a careful and thorough examination been made, it is more than probable that the traces of brains as well as blood, would have been found upon his apparel.

Leaving out the testimony of Mr. Paine, and the proof would rather lead to the conclusion, that the murder was committed on Sunday night, while the parties were journeying together from Milledgeville to Scottsboro', a strange companionship between two such men, one solicited, however, by John, and there is nothing in the proof of Dr. Lamar, or any other witness, to contradict this assumption. But admitting that Mr. Paine is not mistaken in having seen Jack-

John, a slave, *vs.* The State of Georgia.

son in Milledgeville at half past eight o'clock on that particular night, and that Mr. Thomas overheard the violent altercation the next morning, and that this was the death struggle between the combatants, in which Jackson came to his end, still we challenge the closest scrutiny of the testimony and venture the assertion, that there is nothing in all this inconsistent with the idea that John was the slayer of Jackson. It seems to be assumed in the argument that a complete alibi is proven as to the prisoner Monday morning, the witness, Christianna, swears that John came to her house Sunday night, and went out before day, but she does not know at what time he left, and Freeny testifies that she saw John coming from Miss MacDonald's about day-break, and this vague testimony is the whole of the proof upon this subject.

So that in either view of this case, whether the murder took place in the early part of Sunday night, or about day on Monday morning, John has failed by the able efforts of his distinguished counsel, to free himself from the charge of blood-guiltiness, which the testimony fixes upon him and none other.

We cannot grant a new trial on the ground of newly discovered evidence, because the application is not supported by the usual showing. But mainly for the reason that Rabun Collins substantially testifies to the same facts that Mr. Thomas, it is alleged, would prove. And further, that conceding the truth of the statement, in our opinion of this case, as we have already endeavored to show, it would not, and ought not, to change the verdict of the jury.

While we pity the prisoner therefore, who believed, whether rightfully or not, that his wife's affections had been stolen from him by another, and he was thereby maddened to visit with condign punishment, the supposed wrong-doer, yet he must remember that human law, as well as the Divine Lawgiver, has said, " vengeance is mine, and I will repay."

Let the judgment be affirmed.