1. In the instant case, wherein the plaintiffs in error were found guilty of criminal contempt in alleged violation of a temporary restraining order or injunction, and penalties were imposed therefor within the provisions of Code § 24-2615 (5), held, that the temporary restraining order alleged to have been violated was not void, even if for some reason it might have been erroneous, and the court did not err in overruling the demurrer filed by the plaintiffs in error (respondents in the trial court), assailing the petition for citation. The petition did not show that freedom of speech or other constitutional right of respondents would be infringed by requiring them to answer for such alleged contempt.
2. The exceptions to rulings admitting evidence over objections of the respondents do not show error.
3. The reasonable-doubt rule as declared in Code § 38-110, in reference to "criminal cases," does not apply on the trial of one for criminal or quasi-criminal contempt in disobeying an injunctive order, but the preponderance-of-evidence rule applies (Code, § 38-106); and if there is any substantial evidence authorizing a finding that the party or parties charged were guilty of such contempt, and the trial judge so finds, his judgment must be affirmed in so far as sufficiency of the evidence is concerned.
4. The evidence was sufficient to authorize a finding that the respondents, though not then served, had actual knowledge of the restraining order, intentionally violated the same, and induced others to do so. Accordingly, the judgment finding them guilty of contempt and imposing penalties must be affirmed.
 No. 16581. MAY 13, 1949. REHEARING DENIED JUNE 15, 1949.
The plaintiffs in error in this case are J. D. Pedigo and C. L. Ross. They except to a judgment finding them guilty of contempt *Page 393 
in alleged violation of a temporary restraining order, and imposing penalties therefor within the provisions of Code § 24-2615 (5). See general statement applicable to this case and six companion cases, ante, 371, post, — where the allegations of the original suit for injunction, the terms and conditions of the restraining order, and the petition for citation for contempt are all set forth in detail. As shown in that statement, the order which these respondents were charged with violating, temporarily restrained or enjoined them from mass picketing, from any acts of intimidation or force, and from doing other similar acts, as more specifically set out in the order itself. The petition for citation alleged that these respondents violated this restraining order by engaging in mass picketing and by other acts, specifying wherein it was contended that such order had been violated.
The original suit for injunction was filed on October 25, 1948, and the injunctive order was issued on that date. The petition for citation was filed on the following day, October 26, and it was alleged therein that these respondents, with full knowledge of such restraining order, had violated the same on the latter date. The respondents demurred generally to the petition for citation on the ground that it alleged no violation of the said injunction, for the reason that it shows that the respondents were exercising their right of freedom of speech, freedom of press, and freedom of assembly, any restraint of which, it was insisted, would be in violation of the due-process clause of the Constitution of the State of Georgia (quoting it as in Code § 2-103), and "of the first and fourteenth amendments to the Constitution of the United States, which provide as follows," quoting both of these amendments. Code §§ 1-801, 1-815. The overruling of such demurrer is one of the alleged errors of which respondents complain in their present bill of exceptions. It is also insisted that the order was void for the reason that the original suit in equity did not state a cause of action, in that it was based upon mere apprehension.
The following is a statement of the salient portions of the evidence. A witness for the plaintiff testified: At 5:30 on the morning of October 26, "a large mass of pickets approached the [main] gate and began a steady walk across the entrance . . the pickets immediately in front of the gates were crowded four *Page 394 
deep and numbered several hundred. . . At 6 a. m. the first Georgia Power bus loaded with passengers stopped in front of the Chatillon Road, and the pickets holding signs stopped in front of the bus slowing it to a stop. One picket, whom the witness could not identify because of the darkness, ran around the bus and peered into the windows and queried the driver. . The bus turned around without going to the end of its usual run and proceeded out Chatillon Road towards town. . . All subsequent Georgia Power busses were treated in a manner similar to that of the first bus. At 7:55 an Associated Transport truck approached the pickets at Cedar Street, and a picket named H. L. Kiser stepped in front and forced the truck to halt. Approximately 10 pickets crowded around the truck, apparently led by J. D. Newton. After talking to the pickets for several minutes the truck driver turned around and went back to town. . . At approximately 5:30 that morning an automobile with a public-address system drove up and intermittently during the day words of encouragement and direction were broadcast to the pickets." It appeared from the testimony of other witnesses for the plaintiff that Pedigo was in the car with the sound system that morning, giving directions to the pickets; that on the following morning, among other things, Pedigo stated over the loud speaker, "keep the line moving, that's a good strong line there, does anyone want to go through that line?"
Another witness testified that he stayed at the watchman's house on the plaintiff's premises from 6 a. m. to 6 p. m. on October 26 except for lunch hour, and that during this time he saw many men picketing at or near the main gate, "among them respondents C. L. Ross" and others named. Other testimony as to mass picketing and its direction by Pedigo was introduced.
It appeared from the testimony of the respondent J. D. Pedigo that he is International Representative of Textile Workers Union of America, and was in charge of the strike which began some month and a half prior to the hearing. He procured time for a radio speech by Mr. Ross on October 25, and wrote the speech. The speech thus prepared by Pedigo and read over the radio by Ross was as follows: "Good Evening: Mr. W. Y. Brown will be on the air in the next few minutes, and goodness only knows what he will say. You may have heard that we have *Page 395 
been enjoined against mass picketing. We have talked to our attorneys, Wright Scoggin, and they tell us that such an injunction, before there has been mass picketing, is without precedent and absolutely illegal. So regardless of what Mr. W. Y. Brown says, let's all be on the line at 5:30 in the morning."
Pedigo further testified: He did not know the terms of the injunction until between 7:30 and 7:45 of the morning of October 27. He prepared the speech to be read by Mr. Ross because people started telephoning him about 7 o'clock that night saying Mr. W. Y. Brown of the Celanese Corporation was going to make a speech. Several of the people who telephoned him stated that Mr. Brown was going to make a speech about an injunction against mass picketing, and because the people kept telephoning the witness he requested radio time to stop the calls and ease the people's minds. He did not intend to violate through such speech any order that the court had granted. He went to the picket line the following morning and used a sound system, the purpose of which was to make sure that the picketing was orderly, that the crowd was orderly, that there was no disturbance, and that nobody was interfered with who wanted to go into the plant or come out of the plant. He neither prepared nor authorized any abusive picketing or abusive placards nor anything of that kind. He left the picket line at approximately 7:45 a. m. (October 26). He guesses that probably a couple of hundred people were around the property when he first went there on the morning of October 26, and that number increased while he was there. The maximum number who were in and around the street and across the street and walking in front of the gate while he was there was around 400 to 500. He heard no abusive language or violence. He did not see any truck stopped near the intersection of Cedar Street and Chatillon Road, and never heard of any incident until hearing the affidavits of the plaintiff read. He did not see the stopping of any Georgia Power Company buses, and did not know that it occurred until hearing the plaintiff's affidavits. He has since learned of the provisions of the order of the court and has undertaken to see that the order was completely carried out in all its particulars.
The witness further testified: He consulted the Union's attorney, *Page 396 
Mr. Scoggin, about 8:30 p. m. October 25, before he wrote the radio script read by Mr. Ross that night. At that time he had not heard that there was an injunction issued. The reason he referred to an injunction in the radio script by saying, "You may have heard that we have been enjoined from mass picketing," was because they had heard that Mr. W. Y. Brown was going to make a statement on the radio that they were going to be enjoined. He talked with Mr. Scoggin around 8:30 p. m., and told him some of the people had been calling in reference to the talk which Mr. Brown was going to make about an injunction that had been issued against the people, and he asked Mr. Scoggin if before a person had committed any act or unlawful act he thought they could be enjoined before the commission of such act, and Scoggin said he had never heard of it; also that he did not believe such an injunction would stand up as being constitutional. He had no knowledge of the injunction at that time. He asked Mr. Scoggin about such an injunction in a general manner and not with specific reference to any certain injunction.
It appeared from the testimony of an employee of the radio station that "at 9:22 and a half p. m." October 25, 1948, C. L. Ross read an announcement over the radio, being the one written by Pedigo and referred to in his testimony; also that on the same evening a "statement for Celanese was read by Capp Hicks, an employee of the radio station, and included the restraining order granted October 25; the part of the statement preceding the reading of such order being: "Judge H. E. Nichols of the Floyd Superior Court signed an order granting the prayers of the petition of Celanese Corporation of America which was filed in the superior court this evening, restraining and enjoining the defendants and their associates, affiliates, allies, and confederates from mass picketing on company property, violence, following any employees in going to and from work, and in any other way bothering any one from doing business with the company, limiting the number of pickets at a post, and prescribing the minimum distance between posts."
The respondent C. L. Ross testified: At the time he made the speech on the radio he had not been served with any injunction *Page 397 
and was not served until October 27. At the time he made the speech he did not know the terms of the injunction. He made the radio talk at the request of Joe Pedigo. He heard part of the radio talk on behalf of Celanese by Capp Hicks, in which the order of the court was read, following the witness's talk. He was still in the radio station when Hicks made the company's announcement, but was not paying attention to the talk given by Hicks. He heard the announcement leading up to the reading of the order of the court when such order was being read, and he could see it was something he would have to study to get anything out of, so he paid very little attention to it and did not listen to it after the very beginning.
1. By an act approved March 27, 1947, mass picketing and various other acts in relation to picketing were declared unlawful. Ga. L. 1947, p. 620. While the statute in section 6 provided that "any person who violates any of the provisions of this act shall be guilty of a misdemeanor," this did not prevent the plaintiff from invoking its other provisions as embodying rules of civil conduct. The penal clause as such is entirely immaterial in the present case. See Donaldson v.Great Atlantic Pacific Tea Co., 186 Ga. 870 (199 S.E. 213, 128 A.L.R. 456). Independently of statute, mass picketing may within itself, by reason of the large number of persons engaged therein, amount to intimidation. Jones v. Van Winkle Gin c.Wks., 131 Ga. 336 (3), 341 (62 S.E. 236); American Steel Foundries v. Tri-City Central Trades Council, 257 U.S. 184
(5), (8), 203, 206-207 (42 Sup. Ct. 72, 66 L. ed. 189, 27 A.L.R. 360); Goldfinger v. Feintuch, 276 N.Y. 281, 286
(11 N.E.2d 910 (4), 116 A.L.R. 477 (7); 31 Am. Jur. 954, § 244. The right to exercise freedom of speech by means of peaceful picketing carries with it no right to use force, violence, intimidation, harassment, or the like. Robinson v. Bryant,181 Ga. 722 (184 S.E. 298); Local Union No. 3871, UnitedSteel Workers of America v. Fortner, 202 Ga. 206 (5) (42 S.E.2d 734); Burgess v. Georgia, Florida c. Ry. Co.,148 Ga. 417 (96 S.E. 865); American Steel Foundries v. Tri-City Central Trades Council, 257 U.S. 184, 206 (supra). *Page 398 
The petition for citation did not show that freedom of speech or other constitutional right of the respondents would be infringed by requiring them to answer for the alleged contempts.
Whether or not the original suit for injunction may have been subject to demurrer for some reason, it undoubtedly contained enough to amend by, and the temporary restraining order, therefore, could not in any view be considered as a void order.Haynes v. Armour Fertilizer Works, 146 Ga. 832
(92 S.E. 648). It is still outstanding, never having been reversed or set aside, and it was not subject to the attack made upon it by the respondents in their demurrer. "Upon the hearing of an attachment proceeding instituted for the purpose of punishing one who is alleged to have violated a restraining order granted by a court having competent jurisdiction of the person and subject-matter, but in the grant of which it proceeded erroneously, the validity of the court's action in originally granting such restraining order cannot be collaterally called in question. Such an order is binding upon the party restrained, until reversed, set aside, or modified by the court granting it, and a disobedience of the direction expressed in such order affords ground for an attachment as for a contempt." Russell v. Mohr-Weil LumberCo., 102 Ga. 563 (1) (29 S.E. 271). See also, in this connection, Code, § 55-201; Dunn v. Harris, 144 Ga. 157,160 (86 S.E. 556); Poss v. Norris, 197 Ga. 513 (3), 517, 518 (29 S.E.2d 705); Corley v. Crompton-Highland Mills,201 Ga. 333 (2), 337 (39 S.E.2d 861); Pedigo v. CelaneseCorporation of America, ante, 371. The court did not err in overruling the demurrer.
2. During the trial, the respondents objected to a statement contained in an affidavit of one J. F. Caylor, tendered in evidence by the plaintiff. They also objected "to the entire line of testimony adduced by cross-examination of defendant Pedigo as respects the contents of and his knowledge of the act of Georgia, 1947, regarding mass picketing."
Both objections were overruled, and error is assigned on such rulings. Neither of these exceptions is sufficient to raise any question as to error. In neither instance does it appear what objection to the evidence was made at the time it was offered, and in the latter instance no evidence or testimony is sufficiently set forth, the expression, "the entire line of testimony" as to a stated subject, being too vague and indefinite. *Page 399 
3. Before considering whether the evidence was sufficient to authorize a finding that the respondents were guilty of contempt as charged, we will deal with the contention that, if these alleged contempts are to be treated as criminal contempts rather than civil, it would be necessary to apply the rule as to reasonable doubt as it is ordinarily stated and applied in criminal cases. Many courts have said that the reasonable-doubt rule should be applied in such a case; indeed, the great weight of authority has apparently taken that view. See, in this connection, Boyd v. U.S., 116 U.S. 616 (6 Sup. Ct. 524,29 L.ed. 746); Gompers v. Buck's Stove Range Co., 221 U.S. 418
(31 Sup. Ct. 492, 55 L. ed. 797); Michaelson v. U.S., 266 U.S. 42
(45 Sup. Ct. 18, 69 L. ed. 162); Lewis v. U.S., 330 U.S. 258
(67 Sup. Ct. 677, 91 L. ed. 884); 17 C. J. S. 113, § 84, d; 12 Am. Jur. 441, § 75; Annotations L.R.A. 1917B, 123-127, 49 A.L.R. 975. However that may be, we think that the question before us is one to be determined by the internal law of this State. Milk Wagon Drivers Union of Chicago, etc. v. Meadowmoor Dairies, 312 U.S. 287, 296 (61 Sup. Ct. 552, 85 L. ed. 837); 17 C. J. S. 72, § 62; 12 Am. Jur. 264-269, §§ 571-573. See alsoSlaton v. Hall, 168 Ga. 710 (148 S.E. 741, 73 A.L.R. 891).
There is no statute in Georgia relating specifically to this question. There is a statement in Drakeford v. Adams,98 Ga. 722 (25 S.E. 833), that would tend to support the respondents' contention as to reasonable doubt, but the statement was clearly obiter. As we have said in the companion case ofPedigo v. Celanese Corporation of America, ante, 371, the violation of the injunctive order in this case did not amount to a crime, nor did the proceeding constitute a criminal prosecution under the law of Georgia. Although such a contempt is often referred to as criminal, we think that it is only quasi-criminal, in that it is a violation of an order of court as distinguished from a penal statute. The reasonable-doubt rule in this State, as stated in the Code, § 38-110, applies by its terms only to "criminal cases." The rule appears to have been codified from the decision in John v. State, 33 Ga. 257, in which the plaintiff in error had been convicted of the crime of murder. See also Giles v. State, 6 Ga. 276 (6); Wasden v. State,18 Ga. 264 (2); Mitchell v. State, 22 Ga. 211 (14) (68 Am. D. 493). *Page 400 
In 1 Greenleaf on Evidence (16 ed., 1899), 158, it is stated: "In criminal cases a rule has grown up that the persuasion must be beyond a reasonable doubt. This distinction seems to have had its origin no earlier than the end of the eighteenth century, and to have been applied at first only in capital cases, and by no means in a fixed phrase, but in various tentative forms. `A clear impression,' `upon clear grounds,' `satisfied,' are the earlier phrases; and then `rational doubt,' `rational and well-grounded doubt,' `beyond the probability of doubt,' and `reasonable doubt' come into use."
In a footnote reference is made to an article in 10 American Law Review (1875), in which article it is stated: "The doctrine of `reasonable doubt,' as now applied in criminal cases, always invoked by the prisoner and his counsel and enforced by the courts, is one of the modern phases of the tendency to exaggerate the proper signification, and to unduly extend the application of the maxim of which we have been speaking [`the law holds that it is better that ten guilty persons escape than that one innocent suffer,' 4 Blackstone 558]. We say modern, because we have not, after a somewhat extended research, been able to find that the phrase had made its appearance in the courts till about the beginning of the present century. Its first appearance, so far as we have been able to determine, was in the high-treason cases tried in Dublin in 1798, as reported by Macnally, who was himself counsel for the defence." Id. 656.
"It is not at all to be wondered at, that, in criminal cases, it has been the rule to require a greater quantity, weight, or certainty of evidence than in civil cases. As to the mode of proof of particular facts, the rules are substantially the same; but as to the amount of evidence upon which a jury would be justified to find the existence of a particular fact, or the truth of a particular allegation, the rules are widely different. When these rules began to take form and consistency, the penal code of England was a fearfully bloody code. Death, without benefit of clergy, was denounced against a multitude of misdoings which would now be considered, if offences at all, offences of a comparatively trivial character. The consequences of conviction to the unfortunate prisoner were not only fearful, but they were irremediable. No humane judge could help commiserating the situation *Page 401 
of the all but foredoomed prisoner. Even Jeffries himself is said to have so far awakened to the fact that he was human, as to have remarked, in Rosewell's case, upon the hardship of refusing to a person charged with felony the request to be heard by counsel and sworn witnesses where life, estate, honor, and all were concerned, when these privileges were allowed in a case involving a `two-penny trespass.'" Id. 651, 652.
The English common law, as it existed prior to May 14, 1776, was adopted as the law of this State by the act of February 25, 1784, except where modified by statute or not adjusted to the conditions or system of government existing here. Harris v.Powers, 129 Ga. 74 (2) (58 S.E. 1038, 12 Ann. Cas. 475). Whether or not the reasonable-doubt rule as now embodied in the Code § 38-110, or in any like form, came to be a part of the law of this State as a result of the act of 1784, or whatever may be its origin, we think it is clear from the foregoing authorities that it applies only in criminal cases, that is, where parties are being tried for the alleged commission of crimes as defined in Code § 26-201; and we have not been able to find anything to indicate that the rule was any part of the common law relating to criminal contempts as it existed prior to May 14, 1776. Nor would the reason for the rule as applied to strictly criminal prosecutions call for similar application to criminal contempts under present-day limitation on punishment for such contempt, as stated in Code § 24-2615 (5), which is only a small fraction of the maximum punishment allowed by law for a misdemeanor (Code, § 27-2506) — the lightest grade of offense falling within the definition of crime, as stated in § 26-201. In connection with Code § 24-2615 (5), see Bradley v. State, 111 Ga. 168
(36 S.E. 630, 50 L.R.A. 691, 78 Am. St. R. 157).
Furthermore, it is the generally accepted view, and it is conceded here, that the preponderance-of-evidence rule applies on the trial of a case of civil contempt, and yet under our law a conviction for civil contempt may bring upon the respondent far more serious consequences in deprivation of liberty and otherwise than the limited punishment permitted by law for criminal contempt. Code, § 24-2615 (5); Cobb v. Black, 34 Ga. 162;Drakeford v. Adams, 98 Ga. 722 (25 S.E. 833); Tindall v.Nisbet, 113 Ga. 1114, 1135 (39 S.E. 450, 55 L.R.A. 225); *Page 402 
12 Am. Jur. 441, § 75. This being true, there would seem to be no valid reason for applying the more stringent rule on a trial for criminal contempt.
There are several decisions by this court which, though relating more directly perhaps to the function of the reviewing court, would clearly indicate that the preponderance rule applies on a trial for criminal contempt in alleged violation of a restraining order. In Cabot v. Yarborough, 27 Ga. 476, decided in 1859, it was held: "Questions of contempt are for the court treated with the contempt; and its decision ought to be final, except, perhaps, in the case in which the decision shows an enormous abuse of the discretion." In Hayden v. Phinizy,67 Ga. 758, the defendant was ordered imprisoned ten days for violating a restraining order issued in an injunction case. It was held: "A chancellor has wide discretion in respect to attachments for violating injunctions, and his decision will not be reversed unless that discretion is grossly abused." In the opinion it was stated: "In this case that discretion has not been abused if the chancellor believed the witnesses for the defendant in error; and where these witnesses are contradicted, it is for him to reconcile or give credit where he believes it ought to go, just as a jury may do, and this court will not interfere with his judgment on the facts unless badly abused." In Warner v.Martin, 124 Ga. 387 (52 S.E. 446, 4 Ann. Cas. 180), the defendant in an injunction case was sentenced to pay a fine of $250 for violating a restraining order. This court said: "The judgment rendered on such a hearing will not be disturbed by the Supreme Court, unless the judge has grossly abused the sound discretion vested in him in such cases"; but that "A judge of the superior court has no power to impose a fine of more than two hundred dollars for contempt in violating a temporary restraining order, where the violation was treated by the judge as a single act"; and the judgment was affirmed with direction that $50 be written off the fine.
In Patten v. Miller, 190 Ga. 152 (5) (8 S.E.2d 786), it was held: "Whether a contempt of court has been committed in the violation of an injunctive order, and how it shall be treated, are questions for the discretion and judgment of the court that issued the order, and its decision will not be interfered with by this court unless there is an abuse of discretion. If there be any *Page 403 
evidence from which the judge could have concluded that his order had been violated, this court, under the above rule, has no power to disturb his judgment." The defendants in that case were adjudged in contempt of an order of court granted in an injunction suit. The above ruling was quoted approvingly inCorley v. Crompton-Highland Mills, 201 Ga. 333, 338
(supra), in which case judgments imposing fines and imprisonments for violating a restraining order issued in a labor-dispute case were affirmed as to some defendants and reversed as to others.
Accordingly, we hold that the rule stated in Code § 38-110, as to criminal prosecutions, does not apply on the trial of one for criminal or quasi-criminal contempt in disobeying an injunctive order, but the preponderance-of-evidence rule applies. Code, § 38-106.
4. Was the evidence sufficient to authorize the judge to find the respondents guilty? As shown in the statement, it appeared without dispute that about 8:30 p. m. on October 25, Pedigo prepared a statement which was to be read over the radio by Ross and was read by the latter accordingly. This statement was in part as follows: "You may have heard that we have been enjoined against mass picketing. We have talked to our attorneys, Wright 
Scoggin, and they tell us that such an injunction, before there has been mass picketing, is without precedent and absolutely illegal. So regardless of what Mr. W. Y. Brown says, let's all be on the line at 5:30 in the morning." This statement clearly indicated actual knowledge by each of the respondents. While they had not been served with a copy of the restraining order at that time, it is the law in this State that "A defendant is bound to obey an injunctive order from the time he has knowledge of it, though not then actually served." Patten v. Miller, 190 Ga. 152
(3) (supra). So, as to such knowledge as the respondents actually had, both were chargeable to the same extent as they would have been had they been duly served with a copy of the order in question; and it is immaterial from what source their information on the subject may have been derived. See also, in this connection, Corley v. Crompton-Highland Mills, 201 Ga. 333
(supra). Considering the evidence as a whole, including the radio address, the question as to the respondents' knowledge presented an issue of fact for determination *Page 404 
by the trial judge, and his finding on that issue cannot be disturbed by this court. See, in this connection, Lewis v.Patterson, 191 Ga. 348 (4) (12 S.E.2d 593).
The evidence further authorized finding that both the respondents, after acquiring knowledge of such restraining order, violated it in the manner alleged in the petition for citation. See statement of evidence, supra.
Judgment affirmed. All the Justices concur.