**Millard C. FARMER, Jr., Petitioner,**

v.

**Noah J. STRICKLAND, Sheriff of Pierce County, Respondent.**

No. 79–3908.

United States Court of Appeals,
Fifth Circuit.
Unit B

Aug. 3, 1981.

David E. Kendall, Washington, D. C., John Charles Boger, New York City, John R. Myer, Atlanta, Ga., Randall M. Clark, Brunswick, Ga., for petitioner.

Dewey Hayes, Dist. Atty., Waycross Judicial Circuit, Douglas, Ga., Tony H. Hight, Pros. Atty. Council of Ga., Decatur, Ga., for respondent.

Before MORGAN, ANDERSON, and THOMAS A. CLARK, Circuit Judges.

THOMAS A. CLARK, Circuit Judge:

The Superior Court of Pierce County, Georgia, twice summarily found attorney Millard C. Farmer, Jr., in criminal contempt of court for contumacious conduct during his representation of a criminal defendant who was being resentenced by the court on a conviction for murder and armed robbery. Having unsuccessfully sought relief in the state courts of Georgia, petitioner Farmer

filed his 28 U.S.C. § 2254 petition for writ of habeas corpus with the United States District Court for the Southern District of Georgia. As we have concluded that the district court was correct in denying the petitioner's habeas corpus petition, we affirm.

In September, 1977, Farmer was representing convicted murderer George Street, whose death sentence had been vacated by the United States Supreme Court, *Street v. Georgia*, 429 U.S. 995, 97 S.Ct. 520, 50 L.Ed.2d 606 (1976), and whose case had been remanded for resentencing to the Superior Court of Pierce County, *Street v. State*, 238 Ga. 376, 233 S.E.2d 344 (1977). The resentencing of Street included jury proceedings before the Honorable Elie L. Holton, Judge of the Pierce County Superior Court. Twice during the proceedings Judge Holton found Farmer in criminal contempt of court and sentenced him to one and three days respectively in the county jail, the sentences to be served consecutively.

The two adjudications of contempt were affirmed by the Georgia Court of Appeals on May 4, 1978, *Farmer v. Holton*, 146 Ga. App. 102, 245 S.E.2d 457 (1978). The Supreme Court of Georgia denied certiorari on September 14, 1978. The United States Supreme Court denied Farmer's petition for writ of certiorari on March 19, 1979, *Farmer v. Holton*, 440 U.S. 958, 99 S.Ct. 1499, 59 L.Ed.2d 771 (1979). On March 28, 1979, the petitioner filed a petition for writ of habeas corpus, along with a motion for a stay of his four-day sentence pending appeal, with the district court. After a hearing on the motion for the stay on April 2, 1979, the district court denied the motion on April 5. Farmer was arrested by Pierce County authorities on April 7 and served his four-day sentence. On August 18, 1979, the district court denied Farmer's petition for writ of habeas corpus.

■■■ Although the petitioner had not yet begun to serve his four-day sentence at the time he filed his petition for writ of habeas corpus with the district court, clearly he was free on bond pending appeal

which is to say he was sufficiently "in custody" for the purposes of 28 U.S.C. § 2254. *Hensley v. Municipal Court, San Jose Milpitas Judicial District, Santa Clara County, California*, 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973); *Capler v. City of Greenville, Mississippi*, 422 F.2d 299 (5th Cir. 1970); *Marden v. Purdy*, 409 F.2d 784 (5th Cir. 1969). The district court had jurisdiction to consider the petition. Accordingly, although the petitioner was no longer in custody pursuant to the Georgia state court judgment at the time of the district court's denial on the merits of the habeas corpus petition, this case is not moot under the holding of *Carafas v. LaVallee*, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968). That case held that once federal jurisdiction over a § 2254 petition has attached in the district court, as it did here, the federal court's jurisdiction is not defeated by the petitioner's release prior to the completion of the federal habeas corpus proceedings. Thus, Farmer's claim is not moot, and we move on to a recitation of the facts and a consideration of the merits of his appeal.

At a motions hearing before Judge Holton on September 14, 1977, before a jury was selected, Farmer called his client, defendant Street, to the witness stand to testify in support of a defense motion to disqualify an assistant prosecutor from participation in the resentencing proceeding. After direct examination, during which Street was addressed as "George" by Farmer, Assistant District Attorney M. C. Pritchard began to cross-examine the defendant, also addressing him as "George." The following colloquy ensued:

Q When did this take place, George?

MR. FARMER: Your Honor, may I object to—I don't mean to harass Mr. Pritchard too awful much, but we will refer to our client George Street by his first name, because that's an affectionate way that we feel about him. And, we've known him a period of time. But, we would insist that when he is referred to by the prosecutors that he be referred to as Mr.

MR. PRITCHARD: In other words, . . .

THE COURT: I will not direct you to do that.

Q Do you have any objection to me calling you George?

MR. FARMER: Yes, sir, Your Honor, I object to—his objection is from us. It is a demeaning thing for you to call black people by their first name and to call white people Mr. We're not going to have a double standard. We're not going to be part of it. And, we're not going to have it.

THE COURT: Objection overruled. You may ask the question.

MR. FARMER: Your Honor, it's a form of discrimination.

THE COURT: The objection is overruled. The objection is noted in the record.

Q George, when did Mr. Strickland ...

MR. FARMER: Your Honor, I object again to him calling my client George. We have stated repeatedly. [Sic.] He has used the term colored folks and he referred to yesterday them. [Sic.] He said, "I'll call them whatever they want to be called." All of those things are racial slurs. This prosecutor is a racist. And, we've got to prevent it from coming through to the jury. We've got to prevent it from coming through to the Court at every stage. We resent the fact that he is referring to the client as Mr. We have been through this situation in this State in which a trial judge allowed and told prosecutors and District Attorneys not to call black people Mr. in his Court. That's got to stop in this State if black people are to have equal justice. And, it can't stop if objection is not made to it at a proper time. If he is to address this individual he will address him as he addresses every other witness. He is not his friend. He is trying to have him electrocuted. And, he should address him as Mr. And, I object most strenuously to him using this term and it's being used in a derogatory and a discriminatory way, just as he was using colored and them and they and those kind of terms. They're all derogatory, racial slurs.

THE COURT: Objection overruled.

Q George, when did ...

MR. FARMER: Your Honor, I object to him referring to our client ...

MR. PRITCHARD: ...

MR. FARMER: ... by any name ...

THE COURT: Don't get up ...

MR. FARMER: ... at all.

THE COURT: Have a seat. Mr. Sheriff?

SHERIFF: Yes, sir.

THE COURT: Sit this gentlemen down by the name of Mr. Farmer. Don't make that objection again. I will let you have it as a continuing objection throughout the trial.

MR. FARMER: May we be heard?

THE COURT: No, sir.

MR. FARMER: May we put up evidence?

THE COURT: No, sir.

MR. FARMER: Your Honor, may we argue this motion?

THE COURT: No, sir. It's already been argued all the Court is going to hear it.

MR. FARMER: Your Honor, may I ...

THE COURT: No, sir.

MR. FARMER: May I have time to prepare a motion?

THE COURT: No, sir.

MR. FARMER: Your Honor, may I prepare a motion?

THE COURT: No, sir.

MR. FARMER: May I make an offer of proof?

THE COURT: No, sir.

MR. FARMER: May I confer with my client?

THE COURT: Not at this point, no, sir.

MR. FARMER: May I advise ...

THE COURT: Your client is on the stand just like ...

MR. FARMER: ... my client regarding his rights?

THE COURT: ... Don't interrupt the Court. Your client is on the stand. You put him on the stand just like any other witness. He will be treated just like any other witness.

MR. FARMER: Your, Honor, I ...

THE COURT: No better or no worse.

MR. FARMER: I didn't put him on the stand to have him discriminated against.

THE COURT: Overruled. Now, don't make that objection again. You have a continuing objection. I mean about the calling him by the name of George.

MR. FARMER: Your Honor, do you object to me calling you Elie?

THE COURT: Mr. Farmer, do not ask the Court any such question as that. That is a direct confront [sic] of the Court of it's [sic] authority. If you do that again I will consider it as a contempt of this Court.

MR. FARMER: What, Your Honor, may I ask the Court. I want to inquire . . .

THE COURT: You are to be quiet at this point and we're going to proceed with the cross examination.

MR. FARMER: When may I make an objection?

THE COURT: Are you going to allow us to proceed with the cross examination of this witness?

MR. FARMER: Your Honor, I feel like in representing my client ...

THE COURT: Mr. Farmer, this Court finds your continual interruption of the Court, your refusal to allow us to continue with examination of this witness to be in contempt of the Court. This Court so finds you in contempt of Court. It is the judgment of the Court that you are contempt [sic] of Court. It's the judgment of the Court that you be sentenced to the common jail of this county for a period of 24 hours. Mr. Sheriff?

The court recessed during which time Farmer was led away to be admitted to bond pending appeal. He returned to the courtroom and resumed his representation of Street. Judge Holton entered a written order of contempt dated September 14 which was signed *nunc pro tunc* on September 20, 1977.

The second summary adjudication of contempt occurred in open court on September 22, 1977, just prior to a sequestered individual *voir dire* examination of prospective jurors. In his representation of Street during those proceedings, Farmer had argued that his client was being subjected to racial discrimination through the jury selection process. Although the superior court trial judge cited 23 pages of transcript in his order adjudging Farmer in contempt, we will reproduce here only those portions of the transcript which seem to be the most relevant exchanges between the court and petitioner Farmer.

THE COURT: Mr. Farmer, we're not going into that in this line of argument. If you want to state your point state it and I'll rule on it. But, I'm not going into any long drawn out argument.

MR. FARMER: All right, sir, the point I want to make is, Your Honor, that I feel that you are discriminating against my client because he's black.

THE COURT: Mr. Farmer, the argument is closed. You have used up your argument. You're overruled. The witness is not struck. Have a seat, sir.

MR. FARMER: Your Honor, may I be heard on another issue?

THE COURT: No, sir. We're going to proceed with the voir dire.

MR. FARMER: Your Honor, may we have an opportunity to deal with at some point if the court will tell us when we can deal with the racial prejudice that is existing in this courtroom and make a record of . . .

THE COURT: You're not going to deal with it at any point.

MR. FARMER: May we make a record on it and show what's happening, Your Honor, that . . .

THE COURT: There's a complete record being made of everything going on in this courtroom.

. . . .

MR. FARMER: Your Honor, the Court has ruled that we can't make a showing on that and the Court has ruled that—I understand the Court's ruling on that matter. I want the Court to understand that our motion is to the Court, that there is a pattern of discrimination that is existing and that this pattern has developed itself as we told the Court in the pre-trial motions that it would develope [sic] itself.

THE COURT: I don't want to hear any more of that.

MR. FARMER: And, I . . .

THE COURT: And, I'm not going to hear it. You're just making an argument and that's all.

MR. FARMER: May we ask the court . . .

THE COURT: No, sir.

MR. FARMER: . . . reporter to reflect in the record the race of the jurors as they come . . .

THE COURT: Certainly you may.

MR. FARMER: All right, sir. Will that be done?

THE COURT: It will be done henceforth from the time you've requested it.

The court continued its examination of prospective jurors.

MR. HAYES [Pierce County District Attorney]: Your Honor, the State at this time would challenge the juror for cause?

THE COURT: All right. Any argument on that?

MR. FARMER: Yes, Your Honor, I think it's complete [sic] obvious that the juror has said without question that the jurors should not, that she could be fair and she could listen to the evidence in here and she could decide the evidence based on what would be presented in this courtroom. Now, I said to the Court previously and I want to reiterate that Mr. Hayes is asking questions that are confusing to the jurors. He is intimidating to the jurors and particularly to . . .

MR. HAYES: Your Honor, the State objects to him arguing that I intimidated a juror, because it's absolutely false. It's been in the presence of the Court. He's just making a statement wanting to falsely accuse me and I object to it.

THE COURT: Go ahead.

MR. FARMER: Yes, sir. Your Honor, that he does ask—he does have a manner that does intimidate black jurors by the way that he proceeds and . . .

MR. HAYES: Your Honor, once again I object to him making a flat, false statement. It's malicious, it's false . . .

THE COURT: Now, you understand, Mr. Hayes, this is an argument and that is the conclusions [sic] that he said he draws from the questions you ask. That doesn't mean that it is true or not true.

MR. HAYES: I object to it further as not being a conclusion, being a personal remark and insulting to me and I object to it.

THE COURT: All right, I don't think it's—well, I'm not—it may not be insulting, but I'm going to let him go ahead with that.

MR. FARMER: And, Your Honor, I think it's completely obvious that these questions are asked in a way that are [sic] confusing to persons who have not served on the jury before and who have not been allowed entry into our systems purely because of the fact of the color of their skin. They have been . . .

MR. HAYES: Your Honor, the State objects to him going into a racial matter. The Court has already instructed him not to do that and he's right back in on it again.

THE COURT: He can leave race out— now, if you—go ahead with the argument. Go ahead.

MR. FARMER: Just as these questions were used in the voter registration days to keep people from being able to register to vote. It can't be used in the same way to keep people from serving on the jury. The juror answered as fairly, as quickly and promptly as anybody could answer on

all the relevant question [sic] when they were asked by the Court and when they were asked by me and they weren't asked in the intimidating way. The question were not understandable [sic] in the way that Mr. Hayes was leading and asking them in a leading way purely for the disqualification because of race.

THE COURT: All right. Strike the juror for cause.

MR. FARMER: Your Honor, may we heard [sic] on the continual discrimination on the part of this Court in the way you're striking these jurors?

THE COURT: No, sir, you may have a seat. And, you will not make any further remarks like that.

After the proceedings recessed for lunch the court permitted Farmer, on behalf of his client, to present testimony concerning alleged intimidation of people who were attending the court sessions. Following testimony given on that subject, the colloquy between the petitioner and the court continued as follows:

MR. FARMER: Your Honor, the reason that we wanted to deal with it at this time is to point out to the Court, is that here are things that we are being able to show you and show the Court that's happening. We are not able to find out about everything that happens. We are only able to, I'm sure, to know a very, very small part of what is happening. And, the Court has got to take corrective action and the Court has got to deal with this in a way that we've previously suggested in order that it will not happen. And, the Court has got to allow us to inquire into what the Court before lunch and previously wants to cover up. And, that is the racism that exists that's effecting [sic] these jurors and effecting [sic] Your Honor ...

MR. HAYES: Your Honor, the State objects to the improper malicious argument he's making on the Court.

THE COURT: All right, Mr. Farmer, the statement that the Court wants to cover it up is a direct contempt of this Court, knowingly made by you. I have repeatedly warned you about this. Again you have sought to make that statement. The Court finds you in contempt of Court, sir, again. The Court sentences you to 3 days in the county jail, ser ...

MR. FARMER: Your Honor, may I be . . .

THE COURT: ... service to begin at the termination of this case. That's all.

MR. FARMER: Your Honor, may I be heard on this?

THE COURT: No, sir.

MR. FARMER: Your Honor, may I have counsel to represent me and present evidence on this issue?

THE COURT: No, sir.

MR. FARMER: Your Honor, may I for the purpose of here forward understand what can be my role in representing Mr. Street as far as bringing out the reason that I feel that he is being denied a fair trial. I don't understand, Your Honor?

THE COURT: You'll have to exercise your discretion and your knowledge as an attorney.

MR. FARMER: Your Honor, ...

THE COURT: That's all.

MR. FARMER: Your Honor, may I . . .

THE COURT: No, sir, we're through with that discussion. All right, call the next juror, Mr. Clerk.

Farmer was admitted to bond pending the appeal of his second contempt conviction. Street's resentencing trial proceeded, with Farmer serving as Street's attorney. Street ultimately received a sentence of life imprisonment.[1]

Farmer raises four issues on appeal. First, he contends that the two contempt convictions violated his fourteenth amendment due process rights because the Georgia state trial court allegedly applied a preponderance of the evidence standard, rather

---

1. Since Street received the most favorable sentence possible under the circumstances, he did not prosecute an appeal.

than the higher evidentiary standard of guilt beyond a reasonable doubt. Second, the petitioner argues that his contumacious conduct was protected by the sixth and fourteenth amendments since he was "vicariously asserting" the constitutional right of his client to be free from racial discrimination in judicial proceedings. Third, Farmer contends that under the decision in *Taylor v. Hayes*, 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974), he was entitled to a hearing on the contempt charges before he was sentenced. Fourth, Farmer argues that he was denied his due process rights because the state trial judge who sentenced him was the "target" of the allegedly contumacious conduct and another judge who was not "personally embroiled" with Farmer should have been appointed to pronounce sentence.

## I.

■ Farmer argues first that he was deprived of his fourteenth amendment due process rights because he was adjudicated in criminal contempt of court and sentenced to jail on a preponderance of the evidence standard of proof rather than on the basis of evidence which established his guilt beyond a reasonable doubt. In his formal orders citing Farmer for criminal contempt, Judge Holton made no reference to any evidentiary standard. On appeal to the Court of Appeals of Georgia, that court held that Farmer's two cases "present criminal contempt clearly and beyond a reasonable doubt." *Farmer v. Holton*, 146 Ga.App. 102, 109, 245 S.E.2d 457, 462 (1978). As the Court of Appeals of Georgia acknowledged in *Farmer v. Holton*, under Georgia law a defendant who is tried for criminal contempt may be convicted on a preponderance of the evidence standard of proof. *See Pedigo v. Celanese Corp. of America*, 205 Ga. 392, 54 S.E.2d 252 (1949), *cert. denied*, 338 U.S. 937, 70 S.Ct. 345, 94 L.Ed. 578 (1950); *Hill v. Bartlett*, 124 Ga.App. 56, 183 S.E.2d 80 (1971). Farmer contends that a party may not be summarily held in criminal contempt for conduct committed in the presence of the court unless the court as trier of fact establishes the contemnor's guilt "beyond a reasonable doubt."

Farmer bases his argument that his guilt on summary criminal contempt should be proved beyond a reasonable doubt on two Supreme Court cases, *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). While this argument is somewhat appealing, its appeal is only superficial. In our view, the concern over the constitutionally acceptable evidentiary standard to be applied to cases such as this is unfounded. Where the criminal contempt is committed totally in the presence of the judge, the several standards of proof have no practical relevance.

In Farmer's case, the facts of his courtroom conduct are undisputed. The judge personally witnessed all of the conduct which was punished as contumacious. When the contempt occurs totally in the presence of the judge, there is no necessity for the production of evidence. Indeed, there is no burden of persuading the trier of fact as there is no fact finding process to be conducted. Where the contumacious conduct is committed in the presence of the court in the immediate view of the judge, it is unnecessary for the court to apply any evidentiary standard of proof in order to summarily hold the contemnor in contempt of court. In such cases, it is a question of law for the court to decide whether the courtroom conduct which is factually undisputed amounts to criminal contempt of court. Therefore, Farmer's first argument is without merit.

## II.

■ Next, relying primarily on *Hamilton v. Alabama*, 376 U.S. 650, 84 S.Ct. 982, 11 L.Ed.2d 979 (1964), *rev'g, ex parte Hamilton*, 275 Ala. 574, 156 So.2d 926 (1963), and *Johnson v. Virginia*, 373 U.S. 61, 83 S.Ct. 1053, 10 L.Ed.2d 195 (1963), Farmer contends that at least his first contempt conviction was unconstitutional because his argument to the judge was protected since he was vicariously asserting the right of George Street not to be addressed as

"George" by the prosecutor. Although Judge Holton ruled that Street was entitled to a "continuing objection," Farmer argues that his refusal to cease his argument once the trial judge had ruled should not be penalized as contempt since it was "[t]he only way to vindicate effectively and fairly Street's right to be free of racial discrimination in the court room [sic]." Appellant's brief at 35. This contention is vacuous.

The decisions in both *Hamilton* and *Johnson* reversed contempt convictions which had been imposed because *the contemnors* had refused to comply with racially discriminatory orders given *to them* in open court by state court trial judges. In *Johnson*, the Supreme Court reversed the contempt conviction of a black man who had refused to obey a Virginia state court trial judge's order to move to the "colored" section of the courtroom. The Court held that "[s]uch a conviction cannot stand, for it is no longer open to question that a State may not constitutionally require segregation of public facilities." 373 U.S. at 62, 83 S.Ct. at 1054. In *Hamilton*, a witness in an Alabama court proceeding refused to answer questions propounded to her by an attorney who addressed the witness by her first name only. She was found in contempt of court upon her refusal to answer the questions until she was addressed correctly. The Supreme Court reversed her conviction based on *Johnson*.

The Georgia trial judge's ruling that Farmer's client could be addressed by his first name, even though clearly racially discriminatory *to the client* under the holding in *Johnson*, certainly cannot be said to have infringed on any rights of Farmer to be free from racial animus. In both *Hamilton* and *Johnson* the accused contemnors had been the victims or targets of racially discriminatory orders issued from the bench. Those circumstances simply are not present in this case. Once an objection has been made by an attorney and the court has made its considered ruling, subsequent contumacious conduct will not be excused merely for the fact that it was committed by an officer of the court during court proceedings in an attempt to protect the rights of the attorney's client.

While we certainly appreciate a lawyer's professional duty to safeguard the constitutional rights of his client, we think that Farmer exceeded the bounds of "fearless, vigorous and effective" advocacy here in persisting in his objections and argument once the trial judge had ruled on the matter and had instructed Farmer not to "make that objection again." The following statement from the Supreme Court's opinion in *Sacher v. United States*, 343 U.S. 1, 72 S.Ct. 451, 96 L.Ed. 717 (1952), is particularly appropriate:

> Of course, it is the right of counsel for every litigant to press his claim, even if it appears farfetched and untenable, to obtain the court's considered ruling. Full enjoyment of that right, with due allowance for the heat of controversy, will be protected by appellate courts when infringed by trial courts. But if the ruling is adverse, it is not counsel's right to resist it or to insult the judge—his right is only respectfully to preserve his point for appeal. During a trial, lawyers must speak, each in his own time and within his allowed time, and with relevance and moderation. These are such obvious matters that we should not remind the bar of them were it not for the misconceptions manifest in this case.

*Id.* at 9, 72 S.Ct. at 455.

Here, Farmer, in both instances, did more than simply vicariously assert his client's right to be tried in an atmosphere free from perceived racial discrimination. The appellant, a practicing attorney with significant courtroom experience, intentionally ignored the trial judge's instruction to desist from pursuing his argument further and also disregarded the judge's warning that continued argument on the matter would risk a contempt citation. Furthermore, Farmer's retort to the judge that, "do you object to me calling you Elie?" is the type of disrespectful, insulting behavior on the part of officers of the court that will not be countenanced in a court of law. We do not "equate contempt with courage or insults

with independence." *Sacher v. United States*, 343 U.S. at 14, 72 S.Ct. at 457.[2]

### III.

■ Farmer next challenges his contempt convictions on the ground that he was not afforded a hearing at which he could have presented evidence in mitigation and argue that his conduct was not contemptuous. In arguing that the decision in *Taylor v. Hayes*, 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1974), is controlling, Farmer contends that under the circumstances of this case the trial judge should not have summarily convicted him for contempt without conducting a hearing on the matter. Although *Taylor* did significantly limit a trial judge's authority to punish contemptuous conduct summarily when the final adjudication of contempt and sentencing are postponed until after trial, it is clear that the use of summary contempt procedures is appropriate in certain circumstances. *United States v. Wilson*, 421 U.S. 309, 95 S.Ct. 1802, 44 L.Ed.2d 186 (1975).[3] We conclude that the state trial court's use of summary contempt proceedings here was not only appropriate but was necessary to maintain the orderly administration of judicial proceedings.

The general powers of Georgia state courts are set forth in Ga.Code Ann. § 24–104.[4] Ga.Code Ann. § 24–105[5] specifically authorizes state courts to "inflict summary contempt of court" only when the contumacious conduct serves to "obstruct the administration of justice." Rule 23 of the Georgia Superior Courts states: "No

attorney shall ever attempt to argue or explain a case, after having been fully heard, and the opinion of the court has been pronounced, on pain of being considered in contempt." Ga.Code Ann. § 24–3323.

In *Taylor v. Hayes* an attorney who had been found in contempt of court nine times during a controversial turbulent trial appealed his convictions contending, *inter alia*, that he was entitled to notice and a hearing before the court finally convicted him and pronounced sentence. After each contemptuous episode during the trial of his client, the attorney had been informed by the trial judge that he "considered" the attorney to be in contempt. However, the judge did not pronounce any of the sentences until after the client's trial had finished, and apparently the attorney was not finally adjudicated in contempt until the conclusion of the trial.

*Taylor v. Hayes* is particularly helpful in delineating when a hearing is necessary in summary contempt proceedings. The Court noted that it was not concerned "with the trial judge's power, for the purpose of maintaining order in the courtroom, to punish summarily and without notice or hearing contemptuous conduct committed in his presence and observed by him." 418 U.S. at 497, 94 S.Ct. at 2702–03. However, the Court added that "[t]he usual justification of necessity . . . is not nearly so cogent when final adjudication and sentence are postponed until after trial." *Id.*, 94 S.Ct. at 2703 (citation and footnote omitted). Therefore, relying on *Groppi v. Leslie*, 404 U.S. 496, 92 S.Ct. 582, 30 L.Ed.2d 632 (1972), the Court held that:

---

**2.** *See also In re McLarty*, 150 Ga.App. 395, 258 S.E.2d 10 (1979).

**3.** *See generally*, Kuhns, The Summary Contempt Power: A Critique and a New Perspective, 88 Yale L.J. 39 (1978).

**4.** Ga.Code Ann. § 24–104 provides in pertinent part:

Every court has power
(1) To preserve and enforce order in its immediate presence, and as near thereto as is necessary to prevent interruption, disturbance, or hindrance to its proceedings.

**5.** Ga.Code Ann. § 24–105 provides in pertinent part:

The powers of the several courts to issue attachments and inflict summary punishment for contempt of court shall extend only to cases of misbehavior of any person or persons in the presence of said courts or so near thereto as to obstruct the administration of justice, the misbehavior of any of the officers of said courts in their official transactions, and the disobedience or resistance by any officer of said court, party, juror, witness, or other person or persons to any lawful writ, process, order, rule, decree, or command of the said courts:

*[B]efore an attorney is finally adjudicated in contempt and sentenced after trial for conduct during trial,* he should have reasonable notice of the specific charges and opportunity to be heard in his own behalf. This is not to say, however, that a full-scale trial is appropriate. Usually, the events have occurred before the judge's own eyes, and a reporter's transcript is available. But the contemnor might at least urge, for example, that the behavior at issue was not contempt but the acceptable conduct of an attorney representing his client; or, he might present matters in mitigation or otherwise attempt to make amends with the court.

*Taylor v. Hayes,* 418 U.S. at 498–99, 94 S.Ct. at 2703 (emphasis supplied).

Unlike *Taylor,* however, here Farmer was "finally adjudicated in contempt and sentenced" *during* trial for conduct which certainly threatened the orderly administration of judicial proceedings. The petitioner acknowledges the significant distinction between *Taylor* and the facts presented here but contends that the distinction is not fatal to his argument that a hearing was required because the State of Georgia had no compelling state interest in denying the contemnor an opportunity to be heard on the matter. Specifically, Farmer submits that Judge Holton had not finally adjudicated him in contempt during the trial since the court's formal written contempt orders were entered *nunc pro tunc* approximately one week after each episode occurred. We are not persuaded.

While we recognize that "[s]ummary punishment always, and rightly, is regarded with disfavor," *Sacher v. United States,* 343 U.S. at 8, 72 S.Ct. at 454, there is no doubt that the summary contempt power is still available to courts, under the appropriate circumstances, to control judicial proceedings. *United States v. Wilson, supra.* As the Supreme Court noted in reviewing a case of contempt committed in a state court proceeding, "[i]nstant action may be necessary where the misbehavior is in the presence of the judge and is known to him, and where immediate corrective steps are needed to restore order and maintain the dignity and authority of the court." *Johnson v. Mississippi,* 403 U.S. 212, 214, 91 S.Ct. 1778, 1779, 29 L.Ed.2d 423 (1971).

Furthermore, in a federal court case involving a lawyer's contempt citation for arguing his client's case, the Supreme Court wrote: "[t]he arguments of a lawyer in presenting his client's case strenuously and persistently cannot amount to a contempt of court so long as the lawyer does not in some way create an obstruction which blocks the judge in the performance of his judicial duty." *In re McConnell,* 370 U.S. 230, 236, 82 S.Ct. 1288, 1292, 8 L.Ed.2d 434 (1962). As the Court of Appeals for the Seventh Circuit explained in the well known contempt case of *United States v. Seale,* 461 F.2d 345 (7th Cir. 1972):

> The unmistakable implication of *In re McConnell,* . . ., is that defiance of the court's order to cease questioning would have actually obstructed the proceedings. As governor of the trial, the trial judge must have the authority necessary to ensure the orderly and expeditious progress of the proceedings. His directives in exercise of this authority must be obeyed; otherwise the clear result would be courtroom chaos. Wholly arbitrary limits on argument will, if prejudicial, merit reversal of the substantive case, but that hardly can excuse open defiance of the court's commands.
>
> .　　.　　.　　.　　.
>
> A certain amount of leeway must be allowed. But where the directive is clear, the judge's insistence on obedience is not undercut by his further rejoinder, and the party directed understands what is being asked of him, he must obey.

*Id.* at 371 (citations and footnote omitted). We emphasize that "[i]t is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country." *Illinois v. Allen,* 397 U.S. 337, 343, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970).

## IV.

■ Farmer's final argument is that he was denied due process of law because the judge who summarily held the appellant in criminal contempt of court also pronounced sentence. The petitioner contends that he and the Georgia state trial judge were "personally embroiled" in the sense that the judge was the "target" of the contumacious conduct. Therefore, relying on the Supreme Court's decision in *Mayberry v. Pennsylvania*, 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971), Farmer submits that he "was entitled to be sentenced by a neutral and detached jurist."

In *Mayberry v. Pennsylvania* a state court defendant, representing himself at trial, engaged in conduct at trial that Justice Douglas described as "a shock to those raised in the Western tradition that considers a courtroom a hallowed place of quiet dignity as far removed as possible from the emotions of the street." 400 U.S. at 456, 91 S.Ct. at 500. Throughout the trial in *Mayberry*, the defendant had verbally attacked the trial judge, accusing him of running a Spanish Inquisition and routinely denouncing the judge in vulgar language. Concluding that throughout the state court trial the trial judge had been the "target" of the contemnor's contemptuous conduct, the Supreme Court recognized that such "a judge, vilified as was this Pennsylvania judge, necessarily becomes embroiled in a running, bitter controversy." 400 U.S. at 465, 91 S.Ct. at 505. As a result, "[n]o one so cruelly slandered is likely to maintain that calm detachment necessary for fair adjudication." *Id.*

In holding that a defendant in a criminal contempt proceeding is entitled to a trial before a judge other than the one who was the target of the allegedly slanderous personal attacks, the Court provided the following general guidelines:

Generalizations are difficult. Instant treatment of contempt where lawyers are involved may greatly prejudice their clients but it may be the only wise course where others are involved. Moreover, we do not say that the more vicious the attack on the judge the less qualified he is to act. A judge cannot be driven out of a case. Where, however, he does not act the instant the contempt is committed, *but waits until the end of the trial*, on balance, it is generally wise where the marks of the unseemly conduct have left personal stings to ask a fellow judge to take his place.

.  .  .  .  .

Whether the trial be federal or state, the concern of due process is with the fair administration of justice. At times a judge has not been the image of "the impersonal authority of law" (*Offutt v. United States*, 348 U.S. 11, 17, 75 S.Ct. 11, 15, 99 L.Ed. 11) but has become so "personally embroiled" with a lawyer in the trial as to make the judge unfit to sit in judgment on the contempt charge.

*Mayberry v. Pennsylvania*, 400 U.S. at 463–65, 91 S.Ct. at 504–05 (emphasis supplied). It should be emphasized at this point that since Farmer's two summary contempt citations were for conduct that took place in open court before the jury had been empaneled, we do not think that the use of the summary contempt power here in any way prejudiced the rights of Farmer's client, George Street.

Furthermore, the Supreme Court also noted in *Mayberry* that,

It is, of course, not every attack on a judge that disqualifies him from sitting. In *Ungar v. Sarafite*, 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921, we ruled that a lawyer's challenge, though "disruptive, recalcitrant and disagreeable commentary," was still not "an insulting attack upon the integrity of the judge carrying such potential for bias as to require disqualification." *Id.*, at 584, 84 S.Ct. at 847.

*Mayberry v. Pennsylvania*, 400 U.S. at 465–66, 91 S.Ct. at 505.

That part of the state trial court record which is before us on appeal does not support the petitioner's claim that the Georgia trial judge became "personally embroiled" with the contemnor so that the judge should have requested that another judge

sit in judgment on the contempt charges. In our view, the judge did not demonstrate any bias toward the petitioner's conduct. In fact, the judge exhibited remarkable patience and restraint considering the defiant, disruptive course of conduct followed by the attorney in this case. In both of the contempt episodes, the judge repeatedly warned the petitioner that if he persisted in his argument that he would risk being held in contempt of court. Yet the petitioner knowingly persisted and engaged in sarcastic, disrespectful challenges to the court's rulings and authority. Clearly, the state trial judge "used the summary contempt power only as a last resort." *Commonwealth of Pennsylvania v. Local Union 542, International Union of Operating Engineers*, 552 F.2d 498, 514 (3d Cir. 1977). The trial judge in this case was subjected to disrespectful and sarcastic comments made by the attorney. Notably, Farmer's gibe, "do you object to me calling you Elie?", and his argument that the court was attempting to "cover up" alleged racism in the selection of jurors undoubtedly related to Judge Holton's rulings on the attorney's objections. However, as we have already indicated that the use of the summary contempt power was necessary to maintain the orderly administration of the court proceedings, we do not agree that the petitioner's contumacious conduct rose to the level of personal vilification and scurrilous attacks on the judge so as to disqualify him from pronouncing sentence on the contemnor. Under the circumstances of this case the petitioner's fourteenth amendment due process rights were not violated by the Georgia trial judge's immediate sentencing of the petitioner for the contempt violations.

The order of the district court denying the petition for writ of habeas corpus is AFFIRMED.